## Richmond.

## WESTERN UNION TELEGRAPH CO. v. WILLIAMS.

### MARCH 27th, 1890.

1. CONSTITUTION—*Highways—Telegraphs.*—Condemnation of land for public highway gives only right of passage over it. The absolute property in the land remains in owner. Erection of telegraph poles and wires constitutes an additional servitude on the land. Act February 10, 1880 (Code, secs. 1287–1290), authorizing construction of telegraph lines along any public road, if the use of the highway be not obstructed, without providing any compensation to the land owners, violates the constitutional intention when taking private property for public use without compensation.

2. CORPORATION—*Non-resident—Process.*—There is no error in serving process against a non-resident corporation on an agent thereof resident in the county wherein suit is brought.

Error to judgment of circuit court of New Kent county, rendered October 30, 1888, in an action of trespass on the case wherein James K. Williams was plaintiff, and the plaintiff in error, the Western Union Telegraph company, was defendant. Opinion states the case.

*Staples & Munford* and *Robert Stiles*, for the plaintiff in error.

*Pollard & Sands, R. T. Lacy,* and *W. W. Gordon,* for the defendant in error.

LACY, J., delivered the opinion of the court.

This is a writ of error to a judgment of the circuit court of

New Kent county, rendered on the 30th day of October, 1888. The plaintiff in error constructed its telegraph line upon the county road in New Kent county, where the said road ran over the lands of the defendant in error without his consent and without condemnation proceedings, and without tendering compensation, and refusing to pay compensation therefor. As is alleged in the declaration "against the will of the plaintiff, and violently against the protest of the plaintiff, entered upon the said lands and cut down and destroyed the trees and underwood—fifty pine trees, twenty oak trees, and other trees of the value of $1,950 - and broke down and prostrated a great part of the fences of the said plaintiff, and dug holes in the land of the plaintiff, and put posts there and kept the same there, &c., and encumbered the lands and hindered the plaintiff in the free use and enjoyment thereof." The defendant pleaded not guilty, and moved the court to remove the case to the federal court, which motion to remove the case the court overruled, and the case proceeded to a trial; and upon the trial the jury rendered a verdict in favor of the plaintiff for the sum of $550, upon which judgment was rendered accordingly. Whereupon the defendant, the plaintiff in error here, applied for and obtained a writ of error to this court.

There were sundry exceptions taken at the trial, which were assigned as error here. The first assignment which we will consider, is as to the refusal of the court to give to the jury certain instructions asked by the defendant, and the giving by the court of certain other instructions. The plaintiff moved the court to instruct the jury to the following effect: That " if the jury believe from the evidence that the defendant was at the time of the committing of the alleged trespass, in the declaration mentioned, and still is a telegraph company chartered by this or any other state, and that the road along which it has constructed, and maintained, and still is maintaining its telegraph line in the county of New Kent, was at said time and still is a county road, then the said defendant had, at said

time, and still has the right to construct and maintain its said line along said county road, upon any part thereof, to the width or extent of thirty feet (whether the road-bed actually used by the public was and is of such width or not), provided the ordinary use of said road be not thereby obstructed, and said defendant had at said time, and still has, the right to cut down and trim out such trees or limbs within such width or extent of thirty feet as might interfere with the proper and effective construction, maintenance, and operation of its said line. (2) For the exercise of such right as aforesaid the defendant is not required to obtain permission from, or to make compensation to, the owner or owners of the land upon which said road is located (whether the fee-simple title to the soil upon which the road is located, or the mere easement thereon, be vested in the public). (3) The jury are further instructed that, although the road-bed of said road actually used by the public may not be or have been of the width of thirty feet, and although the overseer of said road may not have complied with the law, in keeping said road clear and smooth and free from obstructions to the legally required width of thirty feet, yet, under the laws and statutes of the commonwealth, the defendant company was authorized to use any part of said legal road of thirty feet to the same extent as if said overseer had strictly complied with the provisions of law requiring him to keep said road clear of timber and other obstructions to the required width, and the whole thirty feet been actually used by the public as a road."

But the court refused to give these instructions of the defendant, and gave the following: (1) The court instructs the jury that the law presumes that the ownership of lands along the side of a public road in Virginia extends to the middle of said road, and the burthen of proof is upon the party who claims otherwise to show that such is not the case along the road when the right is controverted, and the owner has the exclusive right to the soil, subject to its use for the purposes

of the public, and to the right of passage of the public over the same, and being owners of the soil they have a right to all of the ordinary remedies for disturbing of, or injury to their freehold or possession, and any act of the legislature which divests such owners of their rights is unconstitutional and void. (2) The fact that a road is a public road, or highway, does not authorize the digging of holes for the purpose of erecting telegraph posts, and the erecting of posts, and the establishing a telegraph line over the land of a person without his consent, although the same may be erected or done on that part of his premises which is used as a public road." It thus appears that the claim of the defendant is that by reason of the act of assembly of February 10th, 1880 (Acts 1879–80, p. 53–54), it was authorized to construct its telegraph poles and lines along the lands over which the county road runs without making compensation therefor, and that it maintains its right to exercise as to these lands the right of eminent domain therein, take and enjoy what belongs to another, in the exercise of the sovereign power, not only without making any compensation therefor, but without any formal proceedings looking to condemnation of this property under any of the forms of law whatever.

If it is once conceded, or anywise established, that the land in question belonged to the plaintiff, it was his private property, his freehold, as entirely his own throughout all its parts, as the shelter which he had erected, around and over his hearthstone for his habitation and home, and as entirely under the protection of the laws, against the intrusion as the very hearthstone itself. That these lands are the lands of the plaintiff unless he has lost them by the creation of a public road across them, is undeniable, is indeed not denied. Does the creation of a public road through the lands, divest him of the fee in the same?

As to the extent of the right acquired by the public upon opening a highway in Virginia, Mr. Minor in his Institutes.

(vol. 1, p. 120,) says: " The public acquires merely a right of passage, the freehold, and all the profits of the soil, (that is trees, mines, &c.,) belong still to the proprietor from whom the right of passage was acquired, he may therefore recover the freehold in ejectment subject, to the right of way, and may maintain an action of trespass for digging the ground. If it be unknown from which of two adjacent proprietors a highway was at first taken, or if the highway be the boundary between them, they are understood to own, each *ad medium filum viæ.*" Citing Bac. Abr. Highways, (*b*); *Bolling* v. *Mayor of Petersburg, &c.,* 3 Rand., 563 ; *Home* v. *Richards,* 4th Call, 441 ; *Harris* v. *Elliott,* 10th Pet., 25. And this subject is again referred to by Mr. Minor in his second volume, p. 20, as to the ownership of land adjacent to highways, when he says : " The ownership usually extends to the middle of the road, as in the case of a private stream ; or, if the same party owns on both sides, the whole road belongs to him, subject to the public easement of the right of passage in either case." Citing 3 Kent, Comm., 432. In the case of *Home* v. *Richards, supra,* all the judges delivered opinions, and all held that the grant of a right of way does not convey the soil, but only the right to a way over. In the case of *Bolling* v. *Mayor of Petersburg, supra,* a case fully and ably argued in this court by the foremost lawyers of that day, Judge Carr delivered the unanimous opinion of the court. Speaking as to the public highway, he said : " Does this disable the demandant from recovering the land ? It certainly would not, in England, as many cases show." Citing *Lade* v. *Shepherd,* 2 Strange, 1004. In that case the defendant rested one end of a bridge upon the highway. Upon trespass brought, the court said : " It is certainly a dedication to the public, so far as the public has occasion for it, which is only for a right of passage ; but it never was understood to transfer the absolute property in the soil." In *Goodtitle* v. *Alker,* 1 Burr, 143, in ejectment, a special verdict finding that the land was a public street and public highway, Lord

Mansfield says: 1 Rolle, Abr., 392, is express, that the king has nothing but the passage for himself and his people, but the freehold, and all the profits, belong to the owner of the soil. So do all the trees upon it, and mines under it. The owner may get his soil discharged of this servitude or easement of a way over it by a writ of *ad quod dammum*. It is like the property in a market or fair. There is no reason why he should not have a right to all remedies for the freehold, subject still, indeed, to the servitude or easement. An action of trespass would lie for an injury done to it. I see no reason why the owner may not bring ejectment as well as trespass." 1 Wills., 107; 6 East, 154. But it is said that in this country we act on a more liberal scale; that the court will look to the great principles of public policy, and give them effect; that the conveniences of the community requiring highways, they must be had; and, as a mere right of way is not sufficient for the full enjoyment of them, we must consider the commonwealth as vested with a *base fee* in all public highways.

Our business is with the law as it is; and where the power to be exercised is one of so important a character as the taking away the property of the citizen, divesting him of his eminent domain in the soil, I could not consent to take the step unless I saw myself justified by some clear principle of the common law or some plain enactment of the statute. The English cases are pretty strong evidence that the common law confers no such power. I have looked into our statutes, and I can find nothing there to countenance the idea that where a road is established, the fee in the soil, either simple or base, is vested in the commonwealth. On the contrary, I think it is obvious that a right of way is all that the public requires, leaving the whole fee in the owner of the soil. It is for this use of the land by the commonwealth that the owner is compensated. There can be no question as to what the law is in this state, it is well settled. In *Warwick* v. *Mayo*, 15 Gratt., 528, Judge Allen delivered the unanimous opinion of this court to the

same effect. Speaking of a highway, he says, "The easement comprehends no interest in the soil," and cites Judge Swift as saying, in *Peck* v. *Smith*, 1 Conn. R., 103: "The right of freehold is not touched by establishing a highway, but continues in the original owner of the land in the same manner as it was before the highway was established, subject to the easement." He says, further: "Notwithstanding the easement, the owner retains many and valuable interests. * * * He may make any use of it not inconsistent with the enjoyment of the easement." Hare & Wallace's notes to *Dovaston* v. *Payne*, 2 Smith's Leading Cases, 90, where the authorities are collected. After speaking of the English rule and the decisions of some of the states, he says: "In Virginia the rule has been established by an authoritative decision upon the very point in accordance with the doctrine of the English courts," and refers to *Bolling* v. *Mayor of Petersburg*, *supra*. If these principles are thus settled in Virginia, as they certainly are, they are equally as firmly imbedded in the jurisprudence of numerous other states of this country. These are collected and cited by Mr. Angel in his work on Highways, p. 396, sec. 301, *et seq.* and notes. At page 398, sec. 303, this author says: "The principles of the common law, in this respect, have been recognized and adopted by the American courts," citing *Perley* v. *Chandler*, 6 Mass., 454. Under these principles, the plaintiff was entitled to maintain trespass against the defendant, when the said defendant stopped upon his land, instead of passing along, and dug up his soil, and cut down his trees, and tore down and scattered his fence, unless such taking of his property was by due process of law for public uses, upon just compensation. If the use for which the land was taken was a private use, it could not be lawfully taken without his consent. But the use may be conceded to be a public use, and yet to take without just compensation, was unlawful; such taking, without authority of law, was a trespass—and such taking could find no justification in any act of the general assembly. (Art. 5, sec. 14,

Const. of Va.)   It is claimed that the act of assembly, passed February 10, 1880, (Acts 1879–80,) authorized this company to so construct its works upon the land of the plaintiff.   That act should receive a reasonable construction, and be so construed, if possible, as to avoid repugnance to the constitution. And while by that act these companies are authorized to construct their lines and fixtures along the county roads, provided the ordinary use of the road was not obstructed, it is not expressly provided that this may be done without compensation; but the provision is so as not to obstruct the ordinary use.   The commonwealth had and has in these roads nothing but the use—to pass over and along; and the act provides that this use shall not be obstructed by virtue of that act.   But at the conclusion of this paragraph, constituting the last words in it, are these words, "*upon making just compensation therefor;*" and then follow the provisions of the law, which provide for the proceedings necessary to ascertain what is just compensation by condemnation proceedings.   This was certainly the provision of the act as to lands of persons generally, and if the land upon which the highway runs is the private property of the citizen, which it clearly is, should not this language be held to apply to such land as well as to others?   Why not? The commonwealth has no more power to grant the one than the other.   To grant either is to take private property, and this can only be done upon just compensation.   If this is the true construction of this act, the same is in accordance with the constitution of the state; and the plaintiff was entitled to maintain his suit against a corporation which neither took lawfully nor paid a just compensation.   But if the act does provide for the taking of this private property without compensation, then it is void for repugnancy to the constitution of the state, and the plaintiff was entitled to recover, and the instruction of the court was right.

However, it is claimed by the plaintiff in error that, granting that the rights of the plaintiff are what we have stated,

and the commonwealth has only the right to use by going over, still his case is good, because his works are only a use of the easement and constitutes no new taking—no additional servitude. We will now briefly consider this argument.

The right in the commonwealth is to use by going along over; this is the extent of the right. If the right was granted to the defendant to go over simply to carry its messages, then the right granted was in existence before the grant, and the right to go over is not only not disputed, but distinctly admitted. This is the servitude over the land fixed upon it by law, and the whole extent of it. If anything more is taken it is an additional servitude, and is a taking of the property within the meaning of the constitution. To take the whole subject, the land in fee, is a taking. This, however, is the meaning of the term only in a limited sense, and in the narrowest sense of the word. The constitutional provision, which declares that property shall not be taken for public use without just compensation, was intended to establish this principle beyond legislative control, and it is not necessary that property should be absolutely taken, in the sense of completely taking, to bring a case within the protection of the constitution. As was said by a learned justice of the supreme court of the United States: "It would be a curious and unsatisfactory result if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public, it can destroy its value entirely; can inflict irreparable and permanent injury to any extent; can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not

taken for public use.  Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law instead of the government, and make it an authority for invasion of private rights under the pretext of the public good, which had no warrant in the law and practice of our ancestors." Justice Miller in *Pumpelly* v. *Green Bay Company*, 13 Wall., 166.

It is obvious, and it is so held in many cases, that the construction of a railroad upon a highway is an additional servitude upon the land, for which the owner is entitled to additional compensation.  Cooley's Constitutional Limitations, 548; *Ford* v. *Chicago and Northwestern R. R. Co.*, 14 Wis., 616; *Pomeroy* v. *Chicago & M. R. R. Co.*, 10 Wis., 640.  And the ·power of the legislature to authorize a railroad to be constructed on a common highway is denied, upon the ground that the original appropriation permitted the taking for the purposes of a common highway and no other.   The principle is the same when the land is taken for any other purpose distinct from the original purpose, and the reasoning in the two cases is applicable to each.   In the case of *Imlay* v. *Union Branch R. R. Co.*, 26 Conn., 255, it is said : " When land is condemned for a special purpose, on the score of public utility, the sequestration is limited to that particular use.   Land taken for a highway is not thereby converted into a common.   As the property is not taken, but the use only, the right of the public is limited to the use, the specific use, for which the proprietor has been divested of a complete dominion over his own estate.   These are propositions which are no longer open to discussion." *Nicholson* v. *N. Y. & N. H. R. R. Co.*, 22 Conn., 85; *South Carolina R. R. Co.* v. *Steiner*, 44 Ga., 546.   In the case of a telephone company the chancellor, in the case of *Broome* v. *New York & New Jersey Telephone Co.* (5th Central Rep., 814), held that, in order to justify a telephone company in setting up poles in the highway it must show that it has acquired the right to do so, either by consent or condemnation from the

owner of the soil, saying: "The complainant seeks relief
against an invasion of his proprietary right to his land. The
defendant, a telephone company, without any leave or license
from or consent by him, but, on the other hand, against his
protest and remonstrance, and in disregard of his warning and
express prohibition, and without condemnation or any steps to
that end, set up its poles upon his land." What has been said
is sufficient of itself to establish the right of the complainants
to relief: for in order to justify the defendant in setting up the
poles, it is necessary for it to show that it has acquired the
right to do so, either by consent or condemnation from the
owner of the soil. As to these rights of the owner of the soil
see American and English Encyclopædia of Law, vol. 9, title
"Highways," vii., sec. 2; *Board of Trade Tel. Co.* v. *Barnett,*
107 Ill., 508; *Southwestern R. R. Co.* v. *Southern & A. Tel. Co.,*
46 Ga., 43; *Western Union Tel. Co.* v. *Rich,* 19 Kansas, 517;
*Willis* v. *Erie Tel. & Co.,* 34 N. W. Rep., 337.

That the erection of a telegraph line upon a highway is an
additional servitude is clear from the authorities. That it is
such is equally clear upon principle in the light of the Virginia
cases cited above. If the right acquired by the commonwealth
in the condemnation of a highway is only the right to pass
along over the highway for the public, then, if the untaken
parts of the land are his private property, to dig up the soil, is
to dig up his soil; to cut down the trees, is to cut down his
trees; to destroy the fences, is to destroy his fences; to erect
any structure, to affix any pole or post in and upon his land, is
to take possession of his land; and all these interfere with his
free and unrestricted use of his property. If the common-
wealth took this without just compensation it would be a
violation of the constitution. The commonwealth cannot con-
stitutionally grant it to another.

It is true that the use of the telegraph company is a public
use; that company is a public corporation, as to which the
public has rights which the law will enforce. But these pub-

lic rights can only be obtained by paying for them. The use, while in one sense public, it is not for the public generally; it is for the private profit of the corporation. It is its business enterprise, engaged in for gain. Its services can only be obtained upon their being paid for. There is no reason either in law or common justice why it should not pay for what it needs in the prosecution of its business. Upon this burden being placed upon it, it can complain of no hardship; it is the common lot of all. If the said company has use for the private property of a citizen of this commonwealth, and it is of advantage to it to have the same, it is illogical to argue that the property is of small value to the plaintiff, and in the aggregate a great matter to the plaintiff in error. This argument is not worth considering; it cuts at the very root of the rights of property. It would apply with equal force to all the transactions of life. It is sufficient to say the ægis of the constitution is over this as over all other private property rights, and there is no power which can divest it without just compensation.

We think the instructions of the circuit court were clearly right, and there is no error therein.

There is no error in the process in the case. It was made as provided by law against a non-resident corporation having no officer or agent resident in the county.

There was no error in the refusal of the court to remove the case from New Kent county. Not the slightest ground is shown for it. And it may be remarked that the plaintiff in error selected its forum when it thus unlawfully invaded the property rights of one of the citizens of that county.

As to the contention concerning the summoning of the jury by the sheriff, because he was interested in the suit, there is no error in that action of the court below: (1) Because the sheriff does not appear to be in any way interested in the suit, and (2) because the sheriff did not in fact select the jury. Upon objec-

tion made, the judge made out the list and gave it to the deputy sheriff to summon the required *venire*.

Upon the whole case, we are of opinion that there is no error in the judgment appealed from, and the same must be affirmed.

LEWIS, P., dissenting, said:

I take a very different view of the case from that taken in the opinion of the court just read, and, as the case is an important one, I will state the reasons for my dissent. I agree that the act of February 10, 1880, does not provide for additional compensation to the owners of lands abutting on highways along which telegraph lines may be constructed, and, therefore, that the question in the case is, whether, on that account, the act is unconstitutional.

But before proceeding to discuss that question, I will remark that the case, as presented by the record, is quite an extraordinary one. The plaintiff sued to recover damages to the amount of $1,950, although the assessed fee-simple value of his land abutting on the highway is only $175. Yet the jury returned a verdict for $550 damages, and the alleged injury consists, as far as I can ascertain from the record, in planting a single pole strung with wire on so much of the highway as passes over the plaintiff's land, and " cutting trees and underwood " that grew upon the highway; from all which the inference seems to have been drawn by the jury and the court below, that if the plaintiff's land is worth little or nothing for taxation, its value for telegraph purposes is enormous.

Inasmuch, however, as no formal bill of exceptions was filed to the action of the court in overruling the defendant's motion to set aside the verdict (although the record recites that an exception was taken) and there is no certificate of the facts proven or of the evidence, I will confine myself to the

question of the constitutionality of the act; and that depends upon whether the use of a highway for a telegraph line is a new servitude upon the soil, or whether it is included in the original appropriation. If the latter view be the correct one, then there has been no taking of the plaintiff's property, within the meaning of the constitution, under the act in question, but simply the grant of a privilege to use a public easement, which has already been paid for, and which is subject to the regulation and control of the legislature.

What, then, is the nature and extent of the public easement in land condemned for a highway? The plaintiff contends that it is merely a right of passage, and nothing more; and *Bolling* v. *The Mayor of Petersburg*, 3 Rand., 563, is referred to in support of this position.

That case, which adopts the language of the ancient authorities on the subject, does indeed so hold, and when it was decided, the language used was sufficiently comprehensive to cover every then known mode of enjoying the public right. But since that time civilization has advanced; new modes of using the public highways have been discovered, and as the common law adapts itself to the constantly changing wants and conditions of society, the courts have held, and rightly, I think, that the view contended for by the plaintiff is altogether too narrow and restricted; so that the principle, as now established, is that the highways of a state are not only open and free for travel and traffic, but that, with the assent of the legislature, they may be devoted, under the original appropriation, to such other public uses as are consistent with their use as public thoroughfares.

"The more ancient decisions," says Angell, "limited the rights of the public [in highways] to that of passage and repassage, and treated any interference with the soil, other than was necessary to the enjoyment of this right, as a trespass. But the modern decisions have very much extended the public right, and particularly in the streets of populous cities." And

then he goes on to say that, "whether the corporation be the owner of the fee, or whether it be merely the trustee of the streets and highways as such, irrespective of any title to the soil, it has the power [with the sanction of the legislature] to authorize their appropriation to all such uses as are conducive to the public good, and do not interfere with their complete and unrestricted use as highways; and in doing so, it is not obliged to confine itself to such uses as have already been permitted. As civilization advances, new uses may be found expedient." Ang., Highways, sec. 312.

Another author, in treating of the same subject, uses this language: "The use of property taken by the right of eminent domain is not confined to the precise mode or kind of use which was in view at the time of the taking, but may extend to other modes which were then unpracticed and unknown. Where property has been taken for a public use and full compensation made for the fee or a perpetual easement, its subsequent appropriation to another public use—certainly if one of a like kind—does not require further compensation to the owner." Pierce, Railroads, 233.

One of the numerous cases in which this principle has been decided, is *Chase* v. *Sutton Manuf'g Co.*, 4 Cush., 152, in which case Chief Justice Shaw said that where, under the authority of the legislature, in virtue of the sovereign power of eminent domain, private property has been taken for a public use, and a full compensation for a perpetual easement in land has been paid to the owner therefor, and afterwards the land is appropriated to a public use of a like kind, no new claim for compensation can be sustained by the owner of the land over which it passes; and to the same effect is *Peddicord* v. *Balt. &c. Pass. R. Co.*, 34 Md., 463, in which case it was held that the use of the bed of a turnpike for the purpose of a passenger railway was not a new and distinct servitude, which entitled the abutting owners to new compensation, because, in the opinion of the court, such use did not exclude or seriously interfere with

the original modes in which the highway was used, but simply added another in furtherance of the same general object.

"It is true," said the court, "that when the right of way was originally acquired, and when it was granted to the turnpike company, it was not actually contemplated by any of the parties to the acquisition and grant, that it would be used for a passenger railway, yet it may be said to have been within *the legal* contemplation of all that it was to be used for all purposes by which the object of its creation, as a public highway, could be promoted. The parties looked to the future as well as to the present, and it cannot be supposed that the authors of its existence intended otherwise than that it should respond to whatever demands new improvements and increased facilities might make upon it, so only that such demands must be always consistent with its character and purpose as a public highway."

The same principle is laid down with great force and clearness by Chief Justice Shaw in *Commonwealth* v. *Temple*, 14 Gray, 69. In that case it was held that all public easements intended for the common and general benefit, whatever may be their nature and character, are under the control and regulation of the legislature, exercising the sovereign power of the state, and, therefore, that it was competent for that body to authorize a street railway to be constructed and maintained by a private corporation in the public highway. "It is the great merit of the common law," said the eminent jurist who spoke for the court, "that it is founded upon a comparatively few broad, general principles of justice, fitness and expediency, the correctness of which is generally acknowledged, and which at first are few and simple; but which carried out in their practical details, and adapted to extremely complicated cases of fact, give rise to many and often perplexing questions; yet these original principles remain fixed and are generally comprehensive enough to adapt themselves to new institutions and conditions of society, new modes of commerce, new usages and

practices, as the progress of society in the advancement of civilizati n may require."

So in the subsequent case of *Attorney-General* v. *Met. Railroad,* 125 Mass., 515, it was again decided that it is within the power of the legislature to authorize the construction of a street railway, without the consent of the adjoining proprietors, and without additional compensation to them; that the future alteration and use of public streets for public travel must always be subject to reasonable modification by future legislation; that the compensation of the adjoining land owners must be presumed to have been adjusted to such future changes; and that their convenience may be affected thereby without impairing any constitutional right to additional compensation. In other words, that any inconvenience or annoyance resulting from such changes is a merely incidental injury, or *damnum absque injuria;* just as this court has repeatedly decided with respect to incidental injuries to land owners caused by the alteration, in a lawful manner, of the grade of a public street. *Smith* v. *City Council of Alexandria,* 33 Gratt., 208; *Kehrer* v. *Richmond City,* 81 Va., 745.

In Cooley's Constitutional Limitations, 552–55, the author, after remarking that when property is appropriated for a public way, and the proprietor is paid for the public easement, the compensation is generally estimated, in practice, at the value of the land itself, says further that "a strong inclination is apparent to hold that when the fee is taken, it is taken *for any public use whatever* to which the public authorities, with the legislative assent, may see fit afterwards to devote it in furtherance of the general purpose of the original appropriation; and if this is so, the owner must be held to be compensated at the time of the original taking for any such possible use." There is no material difference in principle, however, as the author points out in a note, with regard to the extent of the rights of the public in a highway, whether the fee is in the public or in the adjacent land-owner, or in some third person. In either

case the legislature may, without providing for additional compensation, authorize such uses to be made of the highways as are conducive to the public convenience, and not repugnant to the purposes of the original appropriation.    See, also, *Barney* v. *Keokuk*, 94 U. S., 324.

In many of the states of the Union it has been held that the use of a highway even for a steam railway is not an additional burden upon the land of the adjoining proprietor, which entitles him to increased compensation; and so it was held in the case last mentioned, the supreme court in that particular following the local law of Iowa, in which state the case arose and was decided.    The weight of authority, however, is the other way, the idea being that such a use of the highway is inconsistent with its use by the general public, to which it had been legally appropriated.    And Judge Dillon says that while there is solid ground to distinguish between steam and horse railways, yet there is much to recommend as sound the view that where property is acquired for a street it may be used as a street, under the original appropriation, in such way as the legislature representing the public, and best acquainted with the public needs, may authorize.    2 Dill. Mun. Corp. (3d ed.), sec. 722.

This was substantially the view taken by Chief Justice Gibson, with whom the whole court concurred, in the case of the *Phila. & Trenton R. R. Co.*, 6 Whart., 25, where it is said that as in England a highway is the property of the king as *parens patriæ*, so here it is subject to the paramount authority of the legislature in the regulation of its use by carriages or means of locomotion "*yet to be invented*," and that the remedy for an abuse of this power is with the people, who, by changing their rulers, may change the law.    And it is not easy to see why, upon principle, this should not be regarded as the true solution of this whole matter.

In some of the cases a distinction is suggested between highways in the country and streets within the limits of cities or

towns; according to which the latter may be used for more various uses than the former, as for laying gas and water pipes, the construction of horse railways, sewers, levees, wharves, and other accommodations for the public. But as both the highway and the street are opened for the same general purpose—and a street is a highway—there would seem to be no sound basis for such a distinction.

Much of the confusion in the decisions on the subject of the constitutional power of the legislature over highways is owing, it seems to me, to a failure to discriminate between *the use* for which a highway is appropriated and *the modes* of using it. Hence, in passing upon such questions, a clear idea of what a highway is ought always to be kept in view. And what is a highway? Perhaps no better definition of it, in the light of reason and the modern decisions, can be given than to say that it is a road or thoroughfare for the use of the general public for the purpose of *inter-communication*, which embraces the right to use the highway, not only for passage, but for the transmission of intelligence.

Formerly, as before remarked, the only mode by which intelligence could be transmitted over a highway was by passing over it. But it is not so now. The discovery of the telegraph and the telephone has revolutionized the methods of inter-communication; and I am unable to perceive why, when a message is sent over a telegraph or telephone wire erected on the public highway, the same, or substantially the same, use is not made of the highway as when a message is sent over it by a messenger on foot or on horseback. In the one case, as was well said in the argument at the bar, the message goes with the messenger; in the other, it goes without a messenger—the only difference being in *the mode* of sending it. And it hardly seems in keeping with the progressive spirit of the common law, in eulogy of which so much has been justly written, to say that the new method is not admissible, though with the assent of the legislature, because it was not known to Bracton

or Blackstone.   Said the court in *Dickerson* v *Colgrove*, 100 U.
S., 578:  " The common law is reason dealing by the light of
*experience* with human affairs."   And what experience had our
fathers with electricity, as an element of inter-communication,
in 1825 when *Bolling* v. *Mayor of Petersburg* was decided?
None whatever.

That the new method is not inconsistent with the ordinary
use of a highway is, to my mind, obvious.   Indeed, it is in aid
of it; for it not only furnishes vastly increased facilities of
intercommunication, but it tends to the relief of the highway
by lessening travel over it—which in populous cities, and even
in the country, is no small consideration.   And here it may
be remarked that the statute expressly provides that in no case
shall a telegraph or telephone erected along a highway obstruct
the ordinary use of the highway.   Acts 1879–80, p. 53;  Code,
secs. 1287–1290.

As to the complaint that in constructing its line, the defend-
ant cut down trees of the plaintiff, it is enough to say that it
appears from the record that no poles were planted or trees
cut except on the highway, and this it was as competent for
the defendant to do, under the authority conferred by the leg-
islature to construct its line, as it was for the public authori-
ties, in the first instance, to cut down such trees as stood in
the way when the road was being opened and constructed.
The record recites that " all of the acts complained of as done
by the defendant upon the lands of the plaintiff were confined
to the said legal road of thirty feet, and were necessary to the
proper and effective construction, maintenance and operation
of the said telegraph line of the defendant."

In the argument a number of authorities were cited to
show that it is not competent for the legislature to authorize a
telegraph company to construct its line over the right of way
of a railroad company, without making just compensation
therefor ; and this, I take it, no one will deny.   The road-bed
and right of way of a railroad company—at least in this state—

is as much its property as is its rolling stock, or the money in its treasury, and the one can no more be lawfully taken without just compensation than the other. But that is a very different case from this; for here I have endeavored to show that the plaintiff's property has not been taken; that nothing has been granted but the right to use a public easement, which right, under no circumstances, can last longer than the easement itself.

Fortunately, direct authority is not wanting in support of these views. The precise question has been adjudicated in two well-considered opinions, one by the supreme judicial court of Massachusetts in the case of *Pierce* v. *Drew*, 136 Mass., 75; the other by the supreme court of Missouri in the case of *The Julia Building Ass'n* v. *The Bell Telephone Co.*, 88 Mo., 258, in in both of which cases it was distinctly held that an additional servitude is not imposed by the erection on a public highway of a telegraph or telephone line, under a statute of the state, and that such statute is not unconstitutional, because it makes no provision for additional compensation to the owners of the fee in the highway.

In the first mentioned case, the court, in an able and learned opinion by Mr. Justice Devens, said: "The discovery of the telegraph developed a new and valuable mode of communicating intelligence. Its use is certainly similar to, if not identical with, that public use of transmitting information for which the highway was originally taken, even if the means adopted are quite different from the post-boy or the mail-coach. It is a newly-discovered method of exercising the old public easement, and all appropriate methods must have been deemed to have been paid for when the road was laid out." And he added that "under the clause to regulate commerce among the states, conferred on congress by the constitution of the United States, although telegraphic communication was unknown when it was adopted, it had been held that it is the right of congress to prevent the obstruction of telegraphic

communication by hostile state legislation, as it has become an indispensable means of inter-communication." Citing *Pensacola Telegraph* v. *Western Union. Tel.*, 96 U. S., 1. See also, *Telegraph Co.* v. *Texas*, 105 U. S., 460; *Western Union Tel. Co.* v. *Alabama*, 132 U. S., 472, and cases cited.

In the telephone case, it was said : " If a thousand messages were daily transmitted by means of telephone poles, wires and other appliances used in telephoning, the street through these means would serve the same purpose, which would otherwise require its use either by footmen, horsemen or carriages to effectuate the same purpose. In this view of it, the erection of telephone poles and wires for transmission of oral messages, so far from imposing a new and additional servitude, would, to the extent of each message transmitted, relieve the street of a servitude or use by a footman, horseman or carriage."

In opposition to these views, the case of *Board of Trade Tel. Co.* v. *Barnett*, 107 Ill., 507, has been cited. That case was disapproved of by both the Massachusetts and Missouri courts, and, I think, with good reason. The case decides that there is no difference in principle between a telegraph and a steam railway in a country highway, so far as the abstract question of servitude is concerned, and that as the railway is an additional servitude, so also is the telegraph. But this reasoning, to my mind, is fallacious. In the nature of things, the use of a highway for operating a steam railway more or less excludes the ordinary methods of travel, and is attended with other inconveniences besides. But can this be said of the telegraph ? In what way does a telegraph erected on the side of a highway in the country interfere with the rights of the abutting owner, or with its use as a public thoroughfare ? Does it exclude or obstruct travel ? On the contrary, it is obviously much less of an obstruction than travelers on horseback or in vehicles over the road usually are to one another; and as to any increased dangers or annoyances resulting from the use of streets in a

city for the stringing of numerous wires, of which much has been said, that is not a direct but an incidental injury, which is a matter for the legislature, and not for the courts, to consider; for nobody doubts that, in such cases, the legislature may, if it sees fit, require additional compensation to the owners of the fee to be made.

It has never been questioned, so far as I am informed, that the legislature may authorize telegraph wires to be laid beneath the surface of a street, without additional compensation therefor; and if this can be lawfully done, the power to authorize the wires to be put above the surface would seem to be equally clear, the difference being a mere matter of regulation, as to which, as we have seen, the power of the legislature is unqualified.

As to the case of *Warwick & Barksdale* v. *Mayo*, 15 Gratt., 528, decided in 1860, and to which our attention has been called, I have only a word to say. In that case Allen, P., announced the elementary principle that the right of freehold is not touched by establishing a highway, but continues in the original owner of the land, subject to the public easement, and he referred as authority to the case in 3d Randolph. But no question that arises in the present case arose in that case, or was probably dreamed of; and even if it had been decided that no mode of using the public easement is lawful, without additional compensation to the owner of the fee, than such as was known and practiced a half a century ago, that would be no reason, if the decision is wrong, for perpetuating the error.

Until a comparatively recent period no one ever heard of an instrument under seal being negotiable, and yet, at the present day, there are sealed instruments, the negotiability of which is recognized everywhere, not by virtue of statutes, but because an advanced civilization and the consequent necessities of commerce require it; in other words, because the common law is expansive, or rather comprehensive, enough, to adapt itself to the wants and conditions of modern society.

Another illustration may be drawn from the course of deci-
sion in admiralty.   For more than fifty years after the adoption
of.the constitution, the subordinate Federal courts, following
th. English decisions defining the jurisdiction in admiralty,
held that the admiralty jurisdiction of the United States was
confined to tidewater; and so the supreme court itself decided
in the case of *The Thomas Jefferson*, 10 Wheat, 428.   But in
the case of *The Genesee Chief*, 12 How., 443, which was a case
of collision on Lake Ontario, Chief Justice Taney, speaking
for the court, in one of his most celebrated opinions, pointed
out that while the definition of the jurisdiction, so far as it
related to England, was a sound and reasonable one, because
in that country there was no navigable stream beyond the ebb
and flow of the tide, and that at the time the constitution was
adopted, the definition was, for all practical purposes, a proper
one for this country also, yet that it had ceased to be so, and
accordingly the court declared that the jurisdiction extends to
all waters that are in fact navigable, whether tide-waters or not,
thus overruling its own previous decision on the subject, as
being erroneous because not going far enough.   In the course
of his opinion, the Chief Justice used language which with
propriety may be quoted here.   He said :

" It is the decision in the case of *The Thomas Jefferson* which
mainly embarrasses the court in the present inquiry.   We are
sensible of the great weight to which it is entitled.   But at the
same time we are convinced that, if we follow it, we follow an
erroneous decision into which the court fell, when the great
importance of the question as it now presents itself could not
be foreseen, and the subject did not therefore receive that
deliberate consideration which at this time would have been
given to it by the eminent men who presided here when that
case was decided.   For the decision was made in 1825, when
the commerce on the rivers of the West and on the lakes was
in its infancy, and of little importance, and but little regarded
compared with that of the present day."

I refer to this merely to show into what errors courts sometimes fall by blindly following decisions that are not applicable to our own times and circumstances, forgetting that the world is moving onward, and that common law is common sense dealing by the light of experience with human affairs.   And it is into just such an error, it seems to me, that the court has fallen in the present case.

My opinion, therefore, is that the act in question is constitutional and valid, and that the judgment of the circuit court should be reversed.

RICHARDSON, J., concurred with LEWIS, P.

JUDGMENT AFFIRMED.