Magee v. Overshiner.

MAGEE *v.* OVERSHINER.

[No. 18,158.    Filed March 29, 1898.]

TELEPHONE.—*Construction Of in Streets.—Rights of Abutting Property Owner.*—The reasonable use of the streets of a city for the poles, wires, and necessary equipment of a telephone system is not a new and additional servitude for which the abutting property owner is entitled to compensation. *p. 140.*

SAME.—*Ownership by Individual.*—An individual may own and operate a telephone system without legislative consent, where there is no legislative restriction upon such right. *p. 141.*

From the Howard Circuit Court. *Affirmed.*

*G. W. Funk, D. H. Chase* and *Blacklidge & Shirley*, for appellant.

*S. T. McConnell, A. G. Jenkins, M. Bell, W. C. Purdum, E. B. Goodykoonts,* and *G. M. Ballard,* for appellee.

HACKNEY, J.—Rufus Magee, the owner of a business property fronting upon one of the principal business streets of the city of Logansport and the owner of the fee in the street, brought this suit for a mandatory injunction to cause the removal of a telephone pole placed by the appellee, Overshiner, in the curb-line of the sidewalk in front of said property. The appellee, the owner of the telephone system in said city, placed said pole and strung wires upon the same in the night time, after protest by the appellant, and without compensation to or consent from him.

The principal question in the case is as to whether such use of the street is a servitude not within the contemplated uses of a city street, and, therefore, an additional burden upon the fee of the appellant for which he should be compensated.

The decisions of the courts of this country, so far from establishing a definite rule upon this question, are at such variance as to render hopeless any effort to reconcile them.

At the threshold of our inquiries there are certain well recognized propositions: The owner of the fee in a street which has been dedicated or condemned for a street is entitled to restrict its uses to such as are proper street uses, as stated by most of the decisions, to the uses contemplated at the dedication or condemnation; the public have only an easement for the proper uses of a street. When applied to new uses the fee-owner is entitled to compensation. When a use is by proper public authority, and is not an additional burden upon the fee, no compensation is due the fee-

owner.   In the use of the public easement there is no right to unreasonably burden the fee to the special injury and damage of the fee-owner.

These general propositions, however, are of little service when we revert to the question:   Is the telephone equipment an unnecessary or unreasonable obstruction and a new and additional servitude?   Will it suffice to say that because a street was dedicated or condemned fifty years ago, before electric inventions for lighting, communicating oral and telegraphic messages, and propelling street cars were thought of, it could not, therefore, have been condemned or dedicated in contemplation of the uses therein of such inventions; or that because gas had not been used as a method of lighting, the right to lay pipes to conduct the gas could not have been contemplated; or that because water, for protection against fire, had not been forced through pipes in the streets, such use could not have been contemplated, and so on as to the uses of the street for sewerage, for natural gas piping, for telegraph or telephone lines, above or below the surface of the street, or for the possible future uses of pneumatic tubes for the transmission of mail or parcels, and the distribution of steam or electricity for heating, etc.?   If what was actually contemplated at the time of the dedication should be found to answer the question in every case, many of the uses common to the streets of every city would be additional servitude for which the fee-owner would be entitled to compensation.

It must be, however, that the contemplated uses should be deemed to have been not only in the walking, riding upon horseback and in wagons or other vehicles drawn by animals, in the going and returning upon business, social, religious or political missions,

but also by such methods of travel and communica-
tion, in addition or in substitution for those, as might
come into 'vogue and be accepted and recognized as
proper and important uses of the streets in the vary-
ing needs and demands of commerce, and the relations
of man to man socially and otherwise.   If this were
not true, the way originally dedicated for a suburban
highway, but by the growth of population becoming
a city street, or the dedication of a village or town
street afterwards becoming the principal thorough-
fare of a great city, would be limited to the uses in
vogue at the time and suited to the country road or
the village or town street, and the growth of popula-
tion, the advancement of commerce, and the increase
in inventions for the aid of mankind would be re-
quired to adjust themselves to the conditions existing
at the time of the dedication, and with reference to the
uses then actually contemplated.   That a dedication
or condemnation is deemed to comprehend uses not
actually in the minds of the parties at the time is seen
from the almost unvarying rule that the electric street
railway systems are not a new use and an additional
servitude, but are a new method of enjoying an old
and ever-existing use.   *Eichels* v. *Evansville Street R.
W. Co.*, 78 Ind. 261; *Chicago, etc., R. W. Co.* v. *Whiting,
etc., R. W. Co.*, 139 Ind. 297; *Lockhart* v. *Craig Street
R. W. Co.*, 139 Penn. 419, 21 Atl. 26; *Detroit City R.
W. Co.* v. *Mills*, 85 Mich. 634, 48 N. W. 1007.   They
carry the people by means of a propulsive force which
is a substitute for the horse or mule which formerly
drew the cars.   The horse car was accepted as a con-
veyance added to the numerous kinds of vehicles in
use, and varying in the use of stationary tracks or
railways.

Poles and wires for electric lighting have been
admitted as a proper use on the ground that the

streets are lighted and their general uses thereby made safer and more expeditious. Incidentally, the same use has been employed for supplying light to public, business, and private houses. Sewers have been admitted as not constituting an additional servitude because they afforded a means of drainage for the streets, although one use was in carrying the waste from buildings of the citizens. Gas mains and poles were admitted in like manner as electric lighting systems and for like uses.

In none of these cases has the inquiry been as to whether the fee-owner contemplated such uses, or whether they were in vogue at the time of the dedication. They were always deemed to constitute a beneficial use of the streets as in some degree aiding in the means or opportunities for conducting the affairs of the inhabitants, and in facilitating the communication indispensable to such affairs.

Some of the authorities, reaching the same conclusion, treat the uses of a street, arising from a dedication or condemnation, as expansive, not confined to uses already permitted, but, as civilization advances, admitting new uses. Angell and Ames Corp., section 312; *Julia Building Ass'n* v. *Bell Tel. Co.*, 88 Mo. 258, 57 Am. Rep. 398; *Cater* v. *Northwestern, etc., Co.*, 60 Minn. 539, 63 N. W. 111; *Detroit City R. W. Co.* v. *Mills, supra.*

In *Cater* v. *Northwestern, etc., Co., supra,* it is said: "The question, then, is, what is the nature and extent of the public easement in a highway? If there is any one fact established in the history of society and of the law itself, it is that the mode of exercising this easement is expansive, developing and growing as civilization advances. In the most primitive state of society the conception of a highway was merely a footpath; in a slightly more advanced state it in-

cluded the idea of a way for pack animals, * * consti-
tuting, respectively, the 'iter,' the 'actus' and the 'via'
of the Romans.   And thus the methods of using pub-
lic highways expanded with the growth of civiliza-
tion, until to-day our urban highways are devoted
to a variety of uses not known in former times, and
never dreamed of by the owners of the soil when the
public easement was acquired.   Hence it has become
settled law that the easement is not limited to the
particular methods of use in vogue when the
easement was acquired, but includes all new and
improved methods, the utility and general con-
venience of which may afterwards be discovered
and developed in aid of the general purpose for
which highways are designed.   And it is not material
that these new and improved methods of use were not
contemplated by the owner of the land when the ease-
ment was acquired, and are more onerous to him than
those then in use."

Judge Elliott, in his work on Roads and Streets, p.
529, quotes approvingly from Cooley's Con. Lim., 556,
as follows:   "When land is taken or dedicated for a
town street, it is unquestionably appropriated for all
ordinary purposes of a town street; not merely the
purposes to which such streets were formerly applied,
but those demanded by new improvements and new
wants.   Among these purposes is the use for car-
riages which run on a grooved track; and the prep-
aration of important streets in large cities for their
use is not only a frequent necessity, which must be
supposed to have been contemplated, but it is almost
as much a matter of course as the grading and pav-
ing."

Upon this branch of our inquiries we must conclude,
therefore, upon both reason and authority, that the
uses of streets prevailing at the time of the taking

or dedication of a street are not the limits of the uses to which the public is entitled, and which the soil-owner is deemed to have contemplated, but that such uses are to be enlarged to include all of the additional and improved methods of attaining the same objects and enjoying the same privileges, not, however, to the denial or substantial impairment of the fee-owner's use and enjoyment of his abutting property.

.Is the telephone, with its necessary poles and wires, to be regarded as a new use, so disconnected from the purposes and objects in actual and legal contemplation when our city streets were dedicated or condemned, as to constitute an additional servitude?

The telegraph equipment, in its occupancy of the highway or street, and its uses is the nearest parallel we have to that of the telephone system. They are both inventions for communication by electricity. The equipment occupying the streets is the same. Some authorities have attempted to distinguish between the uses contemplated of city streets and of suburban highways. This distinction was recognized by this court in *Kincaid* v. *Indianapolis, etc., Co.*, 124 Ind. 577, where this language was employed: "There is an essential distinction between urban and suburban highways, and the rights of the abutters are much more limited in the case of urban streets than they are in the case of suburban ways. We note the distinction between the classes of public ways, and declare that the servitude in the one class is much broader than it is in the other."

In Elliott's Roads and Streets, p. 299, it is said: "There is an essential difference between urban and suburban servitudes. The owner of the dominant estate in an urban servitude has very much more authority, and much greater rights than the owner of the

dominant estate in a suburban servitude.   The ease-
ment of the one is very much more comprehensive
than that of the other.   It is doubtful whether, of all
the servitudes, there is one so broad and comprehen-
sive as that of a city in its streets." Again, the same
author says, on p. 307,  "The easement in a city is so
broad and exclusive as to leave very little, if any,
private right of use in the owner of the servient es-
tate."

If this doctrine is accepted, and we think it must be,
the cases which hold that telegraph and telephone
lines upon country highways are an additional serv-
itude cannot be given much weight in determining the
question before us.   However, those cases which hold
that these uses of the suburban ways are not an addi-
tional servitude, if their reasoning is tenable, apply to
the cases of city streets with greater force than to
those of country ways.

Cater v. Northwestern, etc., Co., supra, is such a case.
In addition to the pertinent quotation already made
from that case, we quote the following: "We are not
unmindful that private property cannot be taken for
a public use without compensation, however im-
portant that public use is.   We are not forgetful of
the fact that care should be taken that, in the popular
zeal for modern public improvements, the burden of
furnishing these improvements should not be shifted
from the public, and imposed upon any particular
class of individuals.   But viewing, as we do, high-
ways as being designed as public avenues of travel,
traffic, and communication, the use of which is not
necessarily limited to travel and the transportation
of property in moving vehicles, but extends as well
to communication by the transmission of intelligence,
it seems to us that such a use of a highway is within
the general purpose for which highways are designed,

and, within the limitations which we have suggested, does not impose an additional servitude upon the land; in short, that it is merely a newly-discovered method of using the old public easement."

Another case of the same character is that of *People* v. *Eaton*, 100 Mich. 208, 59 N. W. 145. It was there said: "When these lands were taken or granted for public highways, they were not taken or granted for such uses only as might then be expected to be made of them, by the common method of travel then known, or for the transmission of intelligence by the only methods then in use, but for such methods as the im-provement of the country, or the discoveries of future times, might demand.  *  *  *  · It would be a great calamity to the State if, in the development of the means of rapid travel, and the transmission of in-telligence by telegraph or telephone communication, parties engaged in · such enterprises were compelled to take condemnation proceedings before a single track could be laid or a pole set." This latter propo-sition can be the better appreciated by the supposi-tion that in the city of Indianapolis a telephone com-pany should be required to make legal condemnations as to the twenty thousand or more properties fronting upon the streets of that city.

The cases of *Pierce* v. *Drew*, 136 Mass. 75; *York Telephone Co.* v. *Keesey*, 5 Penn. Dis. Rep. 366 and *Julia Building Ass'n* v. *Bell Tel. Co.*, *supra*, are directly in point in holding that the erection of telephone systems upon city streets is not an additional servi-tude for which the adjacent fee-owner is entitled to damages, but that such use, being an improved method of transmitting intelligence, and a substitute for the messenger upon foot, on horseback, or by vehicle, is within the contemplated uses at the time of the dedication.

In the last case cited, it was said: "These streets are required by the public to promote trade and facilitate communications in the daily transactions of business between the citizens of one part of the city and those of another, as well as to accommodate the public at large in these respects. If a citizen living or doing business on one end of Sixth street wishes to communicate with a citizen living and doing business on the other end, or at any intermediate point he is entitled to use the street, either on foot, on horseback, or in a carriage, or other vehicle in bearing his message. The defendants in this case propose to use the street by making the telephone poles and wires the messenger to bear such communications instantaneously and with more dispatch than in any of the above methods, or any other known method of bearing oral communications. Not only would such communications be borne with more dispatch, but, to the extent of the number of communications daily transmitted by it, the street would be relieved of that number of footmen, horsemen and carriages. If a thousand messages were daily transmitted by means of telephone poles, wires and other appliances used in telephoning, the, street through these means would serve the same purpose, which would otherwise require its use either by a thousand footmen, horsemen or carriages to effectuate the same purpose. In this view of it the erection of telephone poles and wires for transmission of oral messages, so far from imposing a new and additional servitude would, to the extent of each message transmitted, relieve the street of a servitude or use by a footman, horseman or carriage."

In the case of *Pierce* v. *Drew, supra,* a like reasoning is adopted. It is there said: "The discovery of the telegraph developed a new and valuable mode of communicating intelligence. Its use is certainly similar

to, if not identical with, that public use of transmitting information for which the highway was originally taken, even if the means adopted are quite different from the post-boy or the mail coach. It is a newly discovered method of exercising the old public easement, and all appropriate methods must have been deemed to have been paid for when the road was laid out."

In *Hershfield v. Rocky Mountain, etc., Co.*, 12 Mont. 102, 29 Pac. 883, it was held that the telephone equipment was not a new and additional burden upon the fee in a city street, quoting with approval from *Julia Building Ass'n v. Bell Tel. Co., supra.* It is true that it was further held that the fee in the street was not in the abutting owner, but the proposition is distinctly adopted that it is germane to the proper use of streets to allow the setting of poles and wires for the telephone.

In *McCormick v. District of Columbia,* 4 Mackey 396, 54 Am. Rep. 284, the right of the telephone system to occupy the streets as a proper street use was held. The same right was recognized in *Irwin v. Great Southern Tel. Co.*, 37 La. Ann. 63, but it was placed upon the rule that the abutting owner could not complain since the fee in the streets was in the public.

We observe no means of distinguishing against the telephone equipment, on the ground that its poles are not in motion as are ordinary instruments of travel, since the permanent occupancy by the trolley poles, the gas and water pipes, etc., is maintained. See *People v. Eaton, supra; York Telephone Co. v. Keesey, supra.*

If the existence of private benefit to the fee-owner were the turning point between the admission of those things not instruments of travel or movement, as the fire cistern, the illuminating and heating gases, the

water pipes, sewers, etc., and the telephone, it would be exceedingly difficult to establish the absence of private benefit to the property owner and business man in the employment of the telephone.

Opposed to the view of the question as we have presented it are cited several authorities. *Stowers* v. *Postal Telegraph Cable Co.*, 68 Miss. 559, 9 South. 356, involved the right to place telegraph poles upon the sidewalk in the city of Vicksburg. The controlling portion of the opinion is as follows: "There is some conflict in the authorities, but the decided weight is to the effect that telegraph companies form no part of the equipment of a public street, but are foreign to its use, and that where the abutting owner is the owner of the fee to the center of the street he is entitled to additional compensation for the additional burden placed upon his land. Lewis on Eminent Domain, section 131, citing *Tel. Co.* v. *Barnett*, 107 Ills. 507; *Dusenbury* v. *Tel. Co.*, 11 Abb. Cases 440; *Tel. Co.* v. *Lead Co.*, 50 N. Y. Supr. Ct. 488; *Broome* v. *Telegraph Co.*, 42 N. J. Eq. 141; *contra, Hewitt* v. *Tel. Co.*, 4 Mackey 424; *Pierce* v. *Drew*, 136 Mass. 75; *Building Ass'n* v. *Tel. Co.*, 88 Mo. 258." All of the cases cited by the court as in conflict with its opinion have been cited by us. Those cited in support of the opinion are by reference to Lewis on Eminent Domain, where the text is supported by the four cases first named by the court. Of those cases, *Tel. Co.* v. *Barnett, supra*, involved the location of a telegraph pole in a rural highway, as did also *Dusenbury* v. *Tel. Co., supra.* In *Broome* v. *Tel. Co., supra*, the statute authorizing the establishment of a system required that the consent, in writing, of the property owner should be procured for the purpose and without such consent the right was denied. The one case cited in the Stowers case giving it any support was *Tel. Co.* v. *Lead Co., supra.*

That case broadly asserts that the telegraph service is not a street use.   That conclusion is at variance with our conclusion.

Among the other cases cited by counsel for the appellant are *Eels* v. *American Tel., etc., Co.,* 143 N. Y. 133, 10 Am. R. R. and Corp. Rep. 69, 38 N. E. 202; *Western, etc., Co.* v. *Williams,* 86 Va. 696, 11 S. E. 106; *Pacific Cable Co.* v. *Irvine,* 49 Fed. 113, in each of which the question was as to the erection of telegraph poles upon a rural highway and, if the distinction heretofore maintained is correct, are not authorities in this case.

In *Willis* v. *Erie, etc., Co.,* 37 Minn. 347, 34 N. W. 337, the judgment of the trial court, holding the telephone pole upon the city street an additional servitude, was affirmed, upon a division of the court, and for the lack of a majority for either side of the question.   It is therefore of little force as an authority.

The only other decision, thought to be analogous, to which we have been cited, or which our extended researches have discovered, is that of *Chesapeake, etc., Co.* v. *Mackenzie,* 74 Md. 36, 21 Atl. 690.   In that case the complaint was held sufficient upon the general allegation that the pole planted in the footway in front of the plaintiff's warehouse "obstructs and prevents the comfortable and reasonable and beneficial enjoyment and use of said premises" without permission and without payment of compensation.   It was held to present a cause of action for a direct interference with the use of the warehouse, and the question of the use of a street or a highway as an additional servitude was expressly held not to be involved.'   It was held also that the legislature had not and could not authorize the substantial impairment of such beneficial enjoyment of one's property.   We do not, therefore, regard that case as in point.   Nor do we regard

the New York elevated steam railway cases as in point. Those cases correctly held, as we think, that the use of the street for such railway was an obstruction of the easements of access, light and air, if not an unanticipated street use.

Text writers, justly renowned, have grouped many of the cases cited by us, and have variously expressed the opinion that the weight of authority forbids the use of an urban way for telephone equipment. We have found, however, no analysis of the cases, and no attempt by such writers to classify the cases applying to urban and suburban ways and no effort has been made by them to consider the reasons supporting the cases which uphold the use as within the scope of proper street uses.

As we have seen, there are but two decisions of authoritative force supporting the contention of the appellant. Those decisions involved the use of the telegraph equipment, a use, as we have said, more nearly like that of the telephone than any other. The telegraph, however, has never been employed as a means of interurban communication. It requires skilled persons to receive the messages, and then they are to be carried to the persons for whom they are intended by just such means and uses of the streets as would other written communications. The telephone is particularly useful in communications between the people within a city, and it can be used for that purpose directly, and by persons without special skill. It is more clearly a substitute for the old methods of the communication of messages between persons within the city than the telegraph.

We conclude that the reasonable use of the streets of a city for the equipment of a telephone system is not a new and additional servitude for which the abutting property owner is entitled to compensation.

Nor do we agree that the ordinary pole and wires are necessarily a special injury to the enjoyment of the abutting property.

Nor do we agree with the appellant that a telephone system may not be owned and conducted by an individual because of the grant, by the legislature, of such rights to corporations. An individual may conduct any proper business without legislative assent, unless there has been some legislative restrictions upon such right.

If, in the present case, the appellant had been entitled to restrain the use because an additional servitude, the appellee could not have taken the use without an agreement with the appellant or some legislative power to condemn. That question is put at rest by the holding that there is no additional servitude in the erection of the pole. The judgment of the lower court is affirmed.