### CASTLE v. BELL TEL. CO. OF BUFFALO et al.

(Supreme Court, Appellate Division, Fourth Department. March 21, 1900.)

EMINENT DOMAIN—LAYING TELEPHONE CONDUIT—ABUTTING OWNER—DAMAGES.
    An abutting owner of a city lot, even though his fee extends to the center of the street, is not entitled to damages for the laying of an underground telephone conduit in pursuance of a city ordinance, since such a use of the street was for a public convenience, and did not prevent its use as a thoroughfare.
    Laughlin, J., dissenting.

Appeal from special term, Monroe county.

Bill by Wilmot Castle against the Bell Telephone Company of Buffalo and others. From an order vacating an injunction (61 N. Y. Supp. 743), plaintiff appeals. Affirmed.

The plaintiff is the owner of a lot situate upon the west side of Oxford street, in the city of Rochester, the fee of which extends to the center of that street. The Bell Telephone Company of Buffalo for upwards of 20 years last past has owned and operated a telephone system in the same city, and in the conduct of its business has until quite recently maintained and used poles, with wires strung thereon, in the streets of the city. Its system, as thus located, was operated without objection from any source until 1888, when the common council adopted a resolution which in express terms granted to the company the right to erect and maintain its poles and appliances in the city streets; but the privilege thus conferred was subject to certain conditions, one of which was that the company should, "at its own cost, place, and thereafter, at all times maintain its wires and cables and conduits underground in the principal public streets of said city, as rapidly as possible, and to that end shall substitute in place of the present system, at least one-half mile of underground conduits with all its cables and wires therein, in the present year 1888, and not less than one-half mile in each year thereafter, until at least three miles of conduits are completed and all its wires placed therein in the localities, and in the manner designated by, and also under the supervision of the executive board or common council of said city," and should also grant "to the said city the right to the use of all poles now or hereafter erected by said company * * * and of any conduit hereafter laid by it as aforesaid, for the use of maintaining all wires and cables belonging to or used by said city, at any time, in any of its departments or services thereof; * * * including those of the fire alarm telegraph and police patrol systems." All the conditions thus imposed were duly accepted, and their enforcement was provided for by a contract which was subsequently executed by both the company and the city. Oxford street is one of the public streets of the city of Rochester upon which the telephone company had erected its poles and appliances, and through the center of this street there is a grass plat about 20 feet in width, with a roadway upon either side. In pursuance of the requirements of the contract just referred to, the company in November, 1899, employed the defendants Whitmore, Rauber, and Vicinus to remove its Oxford street wires from the poles to which they were then attached, and place them in an underground conduit; and to this end a ditch some 2½ feet in depth and 15 or 20 inches in width was excavated through the center of the grass plat above mentioned,—the intention being to fill up the ditch when the wires were properly secured therein, and replace the sod upon the top thereof so as to interfere as little as possible with the surface of the street. This work was undertaken by permission of the executive board of the city, but before it was consummated the plaintiff brought this action, the main object of which is to restrain the defendants from further operations.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

Joseph W. Taylor, for appellant.

John A. Barhite, for respondents.

ADAMS, P. J. Several propositions are advanced and discussed with a degree of earnestness by the respective counsel in their briefs; but as they are all subsidiary to and dependent upon the right of a telephone company to place its appliances in or upon a public street of a populous and thriving city without making compensation to the owner of the fee, we shall direct our attention solely to the consideration of that feature of the case.

So much has been written respecting the rights and burdens incident to the ownership of land which has been taken for, or dedicated to highway purposes, that a further discussion of the subject would seem almost like a work of supererogation; and yet it will be difficult, if not impossible, to properly consider the important question which this case presents, without referring somewhat to principles which have long since passed beyond the realm of controversy. And at the outset it may be relevant to suggest that a public highway, while primarily intended for the accommodation of travelers employing the ordinary means of locomotion,—such as vehicles drawn by animals,—is nevertheless, in another and broader sense, a public convenience. It is appropriated for that purpose, and, when thus taken or dedicated, nothing remains in the original proprietor but the naked fee; for, as has been well said, lands thus appropriated "are acquired for the purpose of providing a means of free passage common to all the people, and consequently may be rightfully used in any way that will subserve that purpose. By the taking the public acquire a right of free passage over every part of the land, not only by the means in use when the lands were taken, but by such other means as the improvements of the age, and new wants arising out of an increase of population or an enlargement of business, may render necessary. It is perfectly consistent with the purposes for which streets are acquired that the public authorities should adapt them, in their uses, to the conveniences and improvements of the age." Halsey v. Railway Co., 47 N. J. Eq. 380–384, 20 Atl. 859. Recognizing the fact that the "right of free passage" is a comprehensive term, which, in this advanced age, may embrace the transmission of thought and words, as a substitute for the actual physical passage of persons over a public highway, and thereby greatly facilitate social and commercial intercourse, the legislature of this state, in providing for the incorporation of telegraph and telephone companies, has expressly granted to them the right to construct their lines upon any of the public roads, streets, or highways of the state, provided the same shall not be so constructed as to interfere with the public use of such roads or highways. Laws 1848, c. 265, as amended by Laws 1853, c. 471; Transportation Corporations Law, art. 8, § 102. A legislative enactment is, of course, of no value whatever as an authority for an encroachment upon a constitutional right, and in the present instance it is not cited for that purpose, but simply as evidence of a legislative belief that the construction of telegraph and telephone wires in a public highway is not inconsistent with the use for which such highway was originally designed; and this idea is by no means limited to impotent expressions of opinion, for it is one which has received express judicial sanction in some of our sister states, while in our own state it has been adopted by implication, so far, at least, as urban streets are concerned. In Cater v. Telephone Exchange Co., 60 Minn. 539, 63 N. W. 111, 28 L. R. A. 310, which was a case involving the precise question we are now discussing, it was said concerning the rights of an abutting owner, whose fee extended to the center of the street:

"We are not unmindful that private property cannot be taken for a public use without compensation, however important that use is. * * * But, viewing, as we do, highways as being designated as public avenues for travel, traffic, and communication, the use of which is not necessarily limited to travel and transportation of property in moving vehicles, but extends as well to communication by the transmission of intelligence, it seems to us that such a use of a highway is within the general purpose for which highways are designated, and, within the limitations which we have suggested, does not impose an additional servitude upon the land; in short, that it is merely a newly-discovered method of using the old public easement."

In Julia Bldg. Ass'n v. Bell Tel. Co., 88 Mo. 258, the defendant was engaged in erecting poles in a public street, to the center of which the fee was in the plaintiff; and the court, in holding that the poles did not impose an additional burden upon the easement in the street, said, "As civilization advances, new uses may be found expedient."

In Pierce v. Drew, 136 Mass. 75, the supreme court of Massachusetts, in discussing the constitutionality of a legislative grant to a telegraph company of the right to erect its poles and wires in a public highway without compensation to adjoining owners, uses this language:

"When land was taken for a highway, that which was taken was not merely the privilege of traveling over it in the then known vehicles, or of using it in either of the then known methods for either the conveyance of property or the transmission of intelligence. * * * The discovery of the telegraph developed a new and valuable mode of communicating intelligence. Its use is certainly similar to, if not identical with, that public use of transmitting information for which the highway was originally taken, even if the means adopted are quite different from the postboy or the mail coach. It is a newly-discovered method of exercising the old public easement, and by the appropriate methods must have been deemed to have been paid for when the road was laid out."

And the same doctrine has been declared in Indiana (Magee v. Overshimer [Ind. Sup.] 49 N. E. 951, 40 L. R. A. 370), in Michigan (People v. Eaton, 100 Mich. 208, 59 N. W. 145, 24 L. R. A. 721), and in Montana (Hershfield v. Telephone Co., 12 Mont. 102, 29 Pac. 883). It is but fair to say, however, that in several of the states the decisions are not in harmony with those to which attention has been directed, while in others, including our own, the courts have apparently limited the application of the rule for which the defendant is contending to streets in cities. For example, in Lockhart v. Railway Co., 139 Pa. St. 419, 21 Atl. 26, the distinction between an easement in a country and a city street is thus clearly stated:

"It has generally been understood in Pennsylvania that the abutting owner has a fee to the middle of the street, and that the public has only a right of passage over it; but this must not be taken in its literal sense, especially in towns and cities. What might be considered an invasion of private right, so far as the use of a highway is concerned in the country, might not be so in a city. And it may now be taken as settled that the owner's rights as to abutting property are subject to the paramount right of the public, and the rights of the public are not limited to a mere right of way, but extend to all beneficial, legitimate street uses, such as the public may from time to time require."

And again, in Eels v. Telegraph Co., 143 N. Y. 133, 38 N. E. 202, 25 L. R. A. 640, which was a case where the defendant had erected telegraph poles in a country highway, it was held that the

state can neither appropriate to its own special, continuous, and exclusive use, nor can it authorize a corporation to so appropriate, any portion of a rural public highway, by setting up poles therein for the purpose of supporting telegraph and telephone wires. But the court, in reaching this conclusion, recognized the fact that the easement in a public street in a city or village might well be enlarged by the necessities of the case; and it was careful to say that it neither decided nor intimated that "the defendant would not have the right to place its poles in the city street without compensation to the owner, if he owned to the center of the street." Nor is the distinction to which we have adverted altogether a product of recent investigation; for as long ago as 1863 it was said by a jurist of conceded ability that he did not believe it "necessary or possible for the courts to lay down the exact limits of the uses to which land dedicated to a street in a great city may be applied, or for which it may be required." Emott, J., in People v. Kerr, 27 N. Y. 188–203. Subsequently, and in 1875, the language above quoted was cited with approval by the court of appeals, and it was supplemented by the further declaration that:

"It may be urged with some apparent reason that the appropriation of land for a street in a city carries with it the idea that it is to be used for all necessary purposes, as such street, which the interest of the public and the comfort and enjoyment or the health of the locality may demand." Gaslight Co. v. Calkins, 62 N. Y. 386.

In 1883 the general term of the Second department, in speaking of urban streets, asserted that:

"The requirements of the public in such a place are more numerous than in a rural locality, and streets and avenues are to supply such demands. A mere right of passage over the surface is quite insufficient." Crooke v. Waterworks Co., 29 Hun, 245–247.

And in a still more recent case the court of appeals, in referring to the distinction between the two classes of highways, gave utterance to this significant language:

"The public easements, however, in the streets of cities and villages, are more extensive. In urban streets the public conveniences and health and general welfare require that the soil thereof should be subjected to greater burdens. They may be used for the laying of gas and water pipes and the construction of sewers, and some other purposes. The public generally have an interest in, and are benefited by, such improvements, and they are necessities of modern life." Van Brunt v. Town of Flatbush, 128 N. Y. 50, 27 N. E. 973.

The last adjudicated case in which this question has received consideration at the hands of the court of last resort is that of Palmer v. Electric Co., 158 N. Y. 231, 52 N. E. 1092, 43 L. R. A. 672. Considerable stress is there laid upon the distinction which is said to exist between the use of a street for a municipal or mere street purpose, and it was held that, inasmuch as light is necessary to the traveling public, a country highway might be burdened with poles and wires for the purpose of operating an electric light system, whereas it could not be thus burdened for the transmission of intelligence by electricity, because the former is, and the latter is not, a purely street purpose. Whether the use of a street by a telephone system is to be classified as a "municipal purpose" is not stated by

the learned jurist by whom the opinion of the court was delivered, and, so far as this particular case is concerned, it is perhaps of little consequence to which class it ought to be assigned; for we are now dealing with the purpose to which a street in a populous city may properly be devoted, and upon the authority of the cases to which we have referred, including the one last cited, we shall assume that it is now the settled law of this state that in circumstances such as surround the present case the rights of an abutting owner, even though his fee extends to the center of the street, are subject to the paramount right of the public to use such street for any purpose which the enjoyment, comfort, and convenience of the locality may require. And thus we come finally to what we deem the controlling question in this case, viz. is this newly-discovered method of transmitting intelligence a public convenience; and, if so, is it one to the use of which a street in a populous city may be devoted consistently with the general purpose for which that street was originally designed? So far as the first branch of this inquiry is concerned, we assume that it may be unhesitatingly answered in the affirmative; for, of all the discoveries of modern science, the telephone is one of the most wonderful, as it is one of the most useful, and its convenience is more especially appreciated by the residents of large cities, whose homes are generally at a great distance from their places of business. This simple contrivance annihilates space, and by its aid relatives and friends widely separated may communicate with each other, business of vast importance may be transacted, a physician may be summoned in case of illness, and assistance obtained whenever a fire or like calamity overtakes a person. In short, there are a thousand ways in which it can be used to such advantage as to render it well-nigh indispensable to an urban resident. And, this being the case, why is its maintenance a purpose for which a city street may not properly be used? As has been said by an eminent text writer, "With respect to streets in populous places, the public convenience requires more than a mere road to pass over and upon." 2 Dill. Mun. Corp. § 688. And, in the light of recent discoveries, it might be added that public convenience requires that they be used for the very purpose for which the defendants are attempting to use the one in question. We have seen that the transmission of intelligence by electricity is not only a public convenience, but a public necessity; and where, as in the present instance, the means employed for such communication neither disfigure the surface of the street nor interfere in any degree with its use by travelers upon foot or in vehicles, no good reason suggests itself to our mind why it should be regarded as an additional burden entitling the owner of the fee to further compensation. The rule which commends itself to our approval in cases of this character is the one which was laid down by the supreme court of the United States when it declared that:

"On the general question as to the rights of the public in a city street, we cannot see any material difference in principle with regard to the extent of those rights, whether the fee is in the public or in the adjacent landowner, or in some third person. In either case the street is legally open and free for

the public passage, and for such other public uses as are necessary in a city, and do not prevent its use as a thoroughfare." Barney v. City of Keokuk, 94 U. S. 324–340, 24 L. Ed. 224.

We conclude, therefore, that the order appealed from should be affirmed.

Order affirmed, with $10 costs and disbursements. All concur, except LAUGHLIN, J., who dissents.

LAUGHLIN, J. (dissenting). Telephone companies are private corporations organized and conducted for the individual profit of the stockholders. The telephone is so extensively used that it seems indispensable to professional men and those engaged in various lines of trade and business, and it is a great convenience to all others who have occasion and financial ability to use it. Strictly speaking, however, the telephone is not a public necessity or convenience. It accommodates and serves the public to no greater extent than street, steam, surface, and elevated railroads; and as to these, regardless of whether they obstruct light, air, and access, it is well settled that their construction is an additional burden upon the owner of the fee. Williams v. Railroad Co., 16 N. Y. 97; Craig v. Railroad Co., 39 N. Y. 404; Henderson v. Railroad Co., 78 N. Y. 423; Story v. Railroad Co., 90 N. Y. 188; Fobes v. Railroad Co., 121 N. Y. 505, 24 N. E. 919, 8 L. R. A. 453; Reining v. Railway Co., 128 N. Y. 163, 28 N. E. 640, 14 L. R. A. 133. Telephones are not essential to the health of the community, or to the safety of the lives or property of the inhabitants of a city. This line is not being constructed for the city, or in fulfillment of any duty to the public enjoined upon the municipality by the legislature. Placing conduits for telephone wires in this avenue is not a proper municipal or street use, as against the owner of the fee. Telephone poles and wires, or conduits for such wires, may not be lawfully erected, strung, or placed in a public street or highway by a private corporation for the purpose of private contract service, without obtaining the consent of the owner of the fee of the street or highway, or acquiring the right so to do by condemnation proceedings. Cases relating to railroads supra; Gaslight Co. v. Calkins, 62 N. Y. 386; Eels v. Telegraph Co., 143 N. Y. 133, 38 N. E. 202, 25 L. R. A. 640; Van Siclen v. Electric Light Co., 45 App. Div. 2, 61 N. Y. Supp. 210; Johnson v. Electric Co., 54 Hun, 469, 7 N. Y. Supp. 716; Telegraph Co. v. Colwell, 50 N. Y. Super. Ct. 488; Edsall v. Howell, 86 Hun, 431, 33 N. Y. Supp. 892; Palmer v. Electric Co., 158 N. Y. 231–235, 52 N. E. 1092, 43 L. R. A. 672. Substantial damages not being alleged, it may be that a court of equity is not required to grant injunctive relief. Wormser v. Brown, 149 N. Y. 172–174, 43 N. E. 524, and cases cited. The majority of the court would not, however, if that were the only question, affirm on that ground; and in affirming they enunciate a new rule of law, which I deem untenable. I therefore dissent, without critically examining the question as to whether or not the order could be sustained upon the other ground.