MICHAEL McCANN v. THE JOHNSON COUNTY TELEPHONE COMPANY.

No. 13,252.   (76 Pac. 870.)

SYLLABUS BY THE COURT.

HIGHWAYS—*Telephone Line Not an Additional Servitude.* The construction and maintenance of a telephone line upon a rural highway is not an additional servitude for which compensation must be made to the owner of the land over which the highway is laid.

Error from Johnson district court; JOHN T. BURRIS, judge. First opinion (not reported) filed November 7, 1903. Reversed. Rehearing granted. Second opinion (which follows) filed May 7, 1904. Affirmed.

*H. L. Burgess,* and *J. P. Hindman,* for plaintiff in error.

*Rossington, Smith & West, Ogg & Scott, Waggener, Doster & Orr,* and *Valentine, Godard & Valentine,* for defendant in error.

The opinion of the court was delivered by

JOHNSTON, C. J. : In constructing a telephone line the Johnson County Telephone Company was proceeding to plant poles along the highway in front of the farm of Michael McCann.  The poles were placed near the hedge-fence on the line dividing the farm from the highway, and were so located as to interfere with the trimming of the hedge, and also with the cutting of the grass and weeds on the roadside.  He brought a suit in injunction, alleging that the company had not obtained his consent to plant telephone poles on the highway opposite his farm ; that his interest as the owner of the fee had not been conveyed, condemned or otherwise appropriated ; and that no compensation had been paid to him for the proposed use.  A temporary order, restraining the company from placing poles opposite the plaintiff's farm, was issued, but upon the final hearing it was dissolved and a perpetual injunction was denied.

The question presented now, as at the first hearing of the proceeding, is whether the telephone company may occupy the highway in front of McCann's farm without obtaining his consent or paying him compensation for the right.  Was this a contemplated use when the road was established, or does it constitute an additional servitude ?  It is conceded that if the use was not within the original purpose of the highway, the planting of the poles there without consent or compensation would trench upon the constitu-

tional rights of McCann. The adjoining owner of land holds the fee in a rural highway, and retains the ownership of the land for all purposes not incompatible with its use as a public highway. (*Caulkins v. Matthews*, 5 Kan. 191, 199; *Comm'rs of Shawnee Co. v. Beckwith*, 10 id. 603.) Owning an estate in the land, he cannot be deprived of it by any corporation until full compensation has been made or secured to him, and a possible or probable benefit from the proposed improvement is not to be taken into consideration. (Const., art. 12, § 4.) But if compensation was paid when the highway was established, or, rather, if the easement originally given or obtained included such a use as the maintenance of a telephone line, nothing was taken from the plaintiff and the injunction was rightfully refused.

The purpose of a telephone—the transmission of intelligence between people and places—is a public one, which the public may authorize, regulate, and control. The legislature has authorized the organization of such corporations, and has provided that they may build and maintain lines in the streets and highways of the state; and, further, that they may avail themselves of the power of eminent domain to obtain the right to build and maintain lines upon and over the property of others. (Gen. Stat. 1901, §§ 1251, 1252, 1342, and 1343.) The highway is established for the use of the public, and the telephone line is not only a public convenience, but it is a recognized public use. Is it a contemplated and appropopriate use of a highway, or is it one outside the scope of a rural highway, and therefore an additional burden, for which compensation must be made to the owner?

Few questions have received more consideration from the courts in recent years, or given rise to more

conflict of judicial opinion, than this one. In some cases the use has been limited to travel by such methods as were in vogue when the highway was established, while others include all methods, old or new., and hold it to be immaterial whether they were in use, or even thought of, when the easement was acquired. Some confine the use to moving persons, animals, and vehicles, while others would include stationary appliances used in the propulsion or conveyance of persons and things over the highways. By some it is limited to transportation of persons and things tangible, while others extend it to communications which are transmitted unseen, by electric vibrations. Some treat it as an additional burden when the fee of the highway is in the adjoining owner, and others do not regard it to be such whether the fee is in the public or the adjoining owner. In still others a distinction is made between highways in the country and streets in the city, holding that city streets have always been designed and used for purposes not appropriate to rural highways.

The purpose of the highway is the controlling factor. It is variously defined or held to be for passage, travel, traffic, transportation, transmission, and communication. It is a thoroughfare by which people in different places may reach and communicate with one another. The use is not to be measured by the means employed by our ancestors, or by the conditions which existed when highways were first devised. The design of a highway is broad and elastic enough to include the newest and best facilities of travel and communication which the genius of man can invent and supply. This theory is well brought out in *Cater v. Northwestern Telephone Exchange Co.*, 60 Minn. 539,

543, 63 N. W. 111, 28 L. R. A. 310, 51 Am. St. Rep. 543. It was there said :

"If there is any one fact established in the history of society and of the law itself, it is that the mode of exercising this easement is expansive, developing and growing as civilization advances. In the most primitive state of society the conception of a highway was merely a footpath ; in a slightly more advanced state it included the idea of a way for pack animals ; and, next, a way for vehicles drawn by animals — constituting, respectively, the 'iter,' the 'actus' and the 'via' of the Romans. And thus the methods of using public highways expanded with the growth of civilization, until to-day our urban highways are devoted to a variety of uses not known in former times, and never dreamed of by the owners of the soil when the public easement was acquired. Hence it has become settled law that the easement is not limited to the particular methods of use in vogue when the easement was acquired, but includes all new and improved methods, the utility and general convenience of which may afterward be discovered and developed in aid of the general purpose for which highways are designed. And it is not material that these new and improved methods of use were not contemplated by the owner of the land when the easement was acquired, and are more onerous to him than those then in use."

That court held that the construction and maintenance of a telephone line on a country highway did not impose an additional servitude upon it, but was to be regarded more as a newly-discovered method of using an old public easement.

In *The Julia Building Ass'n v. The Bell Telephone Company*, 88 Mo. 258, 268, the question at issue was whether the erection and maintenance of a telephone line along a street of St. Louis subjected it to a new servitude inconsistent with the purpose of a street, and for which an abutting owner might claim com-

pensation.   The court ruled that it was not an additional burden, and in doing so held that streets were designed not only for travel but also to facilitate communications between the citizens of the city, and that when the public acquired the right to a street by any method it could be appropriated not only to such uses as were common at the time but also to all such new uses as advanced civilization might suggest or the public good require; and as showing that the telephone would relieve, rather than add to, the servitude of the street, it was said:

"If a citizen living or doing business on one end of Sixth street wishes to communicate with a citizen living or doing business on the other end, or at any intermediate point, he is entitled to use the street, either on foot, or horseback, or in a carriage, or other vehicle, in bearing his message.   The defendants in this case propose to use the street by making the telephone poles and wires the messenger to bear such communications instantly and with more dispatch than any of the above methods, or any other known method of bearing oral communications.   Not only would such communications be borne with more dispatch, but, to the extent of the number of communications daily transmitted by it, the street would be relieved of that number of footmen, horsemen, or carriages.   If a thousand messages were daily transmitted by means of telephone poles, wires and other appliances used in telephoning, the street through these means would serve the same purpose, which would otherwise require its use either by a thousand footmen, horsemen or carriages to effectuate the same purpose. In this view of it the erection of telephone poles and wires for transmission of oral messages, so far from imposing a new and additional servitude, would, to the extent of each message transmitted, relieve the street of a servitude or use by a footman, horseman, or carriage."

A leading case on this question was determined by

the supreme court of Massachusetts in 1883. Under a statute a telegraph company was about to build a line in the streets of Brookline, and adjacent owners sought to enjoin the authorities from granting the privilege to the company, claiming that the statute was unconstitutional because it did not provide for compensation to the owner of the fee in the highway. The court decided that the transmission of intelligence by electricity was a business of a public character, to be exercised under public control; that when land is once taken for a public use and is afterward applied to another similar public use no new claim for compensation can be sustained by the owner of the fee; that the land taken or granted for highways, for travel on foot, on horseback, or with vehicle, conveying either persons or property and transmitting intelligence, is an easement which should be liberally viewed so as to secure to the public the full enjoyment of such use; and that the transmission of information by electricity was a use similar to, if not identical with, the purpose for which highways were established, and, therefore, no additional servitude was imposed nor other compensation required.. (*Pierce v. Drew*, 136 Mass. 75, 49 Am. Rep. 7.)

The supreme court of Michigan had before it the specific question whether telegraph-poles on a rural highway constituted an additional servitude for which the owners of the fee must be compensated. In answer to the question the court said:

"Public highways are under legislative control. (Cooley, Const. Lim. 588.) They are for the use of the public in general, for passage and traffic, without distinction. The restrictions upon their use are only such as are calculated to secure to the general public the largest practical benefit from the enjoyment of the easement. When the highway is not restricted in

its dedication to some particular mode of use, it is open to all suitable methods. . . . When these lands were taken or granted for public highways, they were not taken or granted for such uses only as might then be expected to be made of them, by the common methods of travel then known, or for the transmission of intelligence by the only methods then in use, but for such methods as the improvement of the country or the discoveries of future times might demand." (*People v. Eaton*, 100 Mich. 208, 211, 59 N. W. 145, 24 L. R. A. 721.)

The court therefore held that the telegraph was a highway use and did not impose an additional burden upon the land occupied.

In *Kirby v. Citizens'.Telephone Co.*, 97 N. W. (S. Dak.) 3, in deciding that a telephone system on the streets of a city was not an additional servitude, the court remarked :

"The streets of a city or incorporated town are, in contemplation of law, dedicated, appropriated or condemned for all proper street uses, and, when a street is used for any proper street purpose by permission of the city authorities, such use does not constitute an additional servitude, though such use may not have been known when the streets were dedicated, appropriated or condemned for street purposes, and the abutting fee-owner is not entitled to compensation for any damages he may sustain by reason of such use. The streets of a city are now used for many purposes unknown in former times. . . . The telephone is but a step in advance of former methods of conveying intelligence and information, and is a substitute for the messenger and carrier of former times."

(Other cases and text-books cited as authorities are : *Magee v. Overshiner*, 150 Ind. 127, 49 N. E. 951, 40 L. R. A. 370, 65 Am. St. Rep. 358 ; *Coburn v. New Telephone Co.*, 156 id. 90, 59 N. E. 324 ; *Hershfield v. Rocky Mt. B. T. Co.*, 12 Mont. 102, 29 Pac. 883 ; *The People,*

*ex rel. McManus, agt. Thompson,* 65 How. Pr. 407; *Palmer v. Larchmont Electric Co.,* 158 N. Y. 231, 52 N. E. 1092, 43 L. R. A: 672; *Hewett v. Telephone Company,* 4 Mackey (D. C.) 424; *Lockhart v. Railway Co.,* 139 Pa. St. 419, 21 Atl. 26; *Maxwell v. Telegraph Co.,* 51 W. Va. 121, 41 S. E. 125; *Castle v. Bell Telephone Co.,* 49 Hun, App. Div. 437, 63 N. Y. Supp. 482, 7 Am. Elec. Cas. 621; Keasb. Elec. Wires, 2d ed., §§ 102, 103.)

The telegraph used in the operation of a railroad is held to be a railway use and not an added servitude upon a railroad right of way. In a certain sense the telephone is an adjunct of the highway as the telegraph is of the railway. It serves to direct travel and transportation over the highway; it keeps persons using the highway and those in authority advised of its condition, and, if necessary, they can provide for repairs; and it enables those who have sent teams and vehicles over it to learn the progress that has been made in the journey. The messages transmitted over the line are a substitute for the messengers who formerly passed over the highway, and thus to a great extent relieve it from the burdens and wear of travel.

No modern invention has contributed more to commercial and social intercourse than the telephone. It is an appliance of great public utility, and is coming into general use in the country as well as in the city. Indeed, it seems to serve a more beneficial purpose, and is a greater convenience to rural residents widely distant from business centers and from one another than it is to residents in cities. The question, however, is not determinable by the difference between urban and suburban conveniences and necessities, or by the fact that the fee may be in the adjoining landowner in one instance and in the public in the other;

it must be decided by the scope and purposes of the highway, and whether, in country or city, it is a means of travel and transportation, a medium of transmission, of intercommunication, between the people located in different places.

We are aware that there are authorities holding that the telephone is not one of the purposes contemplated when the highway was established; that it is not a highway purpose, and, therefore, that it is an additional burden upon the highway, for which compensation must be made to the adjacent owners. We think, however, that the more liberal view should be taken, which is in keeping with the progress of the times, holding the easement to include the modern methods of travel and communication.

The court ruled correctly in refusing the injunction, and therefore its judgment will be affirmed.

SMITH, GREENE, ATKINSON, JJ., concurring.

JOHNSTON, C. J. (dissenting) : I am unable to concur in the conclusion that the construction and maintenance of a telephone line on a rural highway is not an additional servitude, and am compelled to adhere to the view stated in the first opinion by Mr. Justice Pollock, "that a line of telephone, while a means of communication, is not a method of travel, and is not such a use of the property as was in contemplation of law acquired by the public when the highway was laid out, and that the landowner must, under the provisions of our constitution, and by natural right, be held entitled to compensation for this new burden cast upon his property." It is a use which was not only not contemplated when the highway was established, but is one wholly inconsistent with the purposes of a country road.

In Kansas, and in nearly all of the states, a well-recognized distinction exists between the uses to which a rural highway and a city street may be devoted. The density of population and the fact that nearly all of the ground in a city, except the public ways, is covered with permanent structures require that streets and alleys be used for all public purposes. They are used not only for travel, but for light and air, and for laying pipes to conduct water, gas and other materials for both public and private consumption. They are employed for all kinds of traffic and transportation which do not unreasonably interfere with the rights of abutting owners. It is wholly impracticable to provide means for transmission, transportation and communication in a crowded city except through the streets and alleys, and hence a dedication or appropriation of streets and alleys always contemplates every use which public necessity and convenience require. In a city even a commercial railroad may be located in the streets, and if ingress and egress be afforded an abutting owner he has no claim for damages or compensation (*O. O. C. & C. G. Rld. Co. v. Larson,* 40 Kan. 301, 19 Pac. 661, 2 L. R. A. 59) ; but no one would claim that such use is within the scope and purpose of a rural highway.

Again, the ownership of the fee in the highway not only distinguishes it from a city street, but as to the exercise of eminent domain and the maintenance of injunction it is of controlling consequence. If there be no ownership there is nothing to condemn, and if compensation may be had in damages for unreasonable interference with the adjoining owner's ingress and egress, injunction will not be allowed. In a city street the public has not only an easement, but it holds the fee as well. It holds the trust and every

vestige of the title.   The interest which an adjoining owner has in a rural highway is not unimportant or intangible, as is claimed by the telepone company. He retains a title and estate in the highway which gives him substantial rights, of which he cannot be deprived until just compensation shall have been paid or secured.   In *Comm'rs of Shawnee Co. v. Beckwith*, 10 Kan. 603, 607, it was said:

"The fee in the land never passes to the public, but always continues to belong to the original owner.   He continues to own the trees, the grass, the hedges, the fences, the buildings, the mines, quarries, springs, watercourses, in fact, everything connected with the land over which the road is laid out, which is not necessary for the public use as a highway.   (Angell on Highways, ch. 7, §§ 301 to 312, and cases there cited.)   He may remove all these things from the road, or use and enjoy them in any other manner he may choose, so long as he does not interfere with the use of the road as a public highway.   No other person has any such rights."

In respect to the rights acquired by the public, it was remarked:

"The public obtains a mere easement to the land. It obtains only so much of the land, soil, trees, etc., as is necessary to make a good road.   It obtains the right for persons to pass and repass, and to use the road as a public highway only, and nothing more." (See also, *Caulkins v. Matthews*, 5 Kan. 191, 199.)

This early decision, since accepted and followed, declared the purpose of a rural highway to be travel and a right of the public to pass from place to place thereon, and nothing more.   The highway contemplated when the road was laid out was one equally open to the use of every one; not one where a part of it might be permanently and exclusively occupied by private parties and largely for private profit.   The

placing of poles in the highway is a permanent loca-
tion which necessarily excludes the owner of the ad-
joining land and every one else from the part so
occupied.   Here it prevented the plaintiff from trim-
ming his hedge and obtaining the grass which the
court said belongs to him.   The theory of the law
when the road was laid out was that the adjoining
owner had the same rights in the easement granted
as every other member of the public, but he is not
free to use the telephone line and is excluded from
the ground occupied by it.   The supreme court of
New York, in speaking of the contemplated use of
rural highways, said :

"The primary law of the highway is motion, and
whatever vehicles are used, or whatever method of
transmission of intelligence is adopted, the vehicle
must move and the intelligence be transmitted by
some moving body which must pass along the high-
way, either on or over, or perhaps under it, but it
cannot permanently appropriate any part of it."
(*Eels v. A. T. & T. Co.*, 143 N. Y. 133, 139, 38 N. E.
202, 25 L. R. A. 640.)

The telephone, however, is a stationary appliance,
a permanent obstruction, a fixture in the soil, which
necessarily involves exclusive possession.   When the
easement was obtained and paid for by the county,
can it be conceived that the owner understood that he
was surrendering to others the permanent and exclu-
sive possession of a part of the highway, or that the
public understood it was paying for such an occupancy
for the benefit and profit of private individuals or cor-
porations?

Much is said about the utility and convenience of
the telephone, and against any step or decision which
would retard progress or prevent the general use of
all such modern inventions.   All will agree to its

superiority over former methods and that its use should not be unjustly hampered, but such considerations do not require that landowners make donations of their property for the benefit of private or public interests. The advance of civilization, so much talked of, is .desirable, but it would be unjust and is unnecessary to obtain it at the expense of the few. To require telephone companies to pay for property taken for their benefit will not necessarily check progress or prevent improvements. The law treats the telephone business as public and authorizes the condemnation of land required for the operation of a system, when compensation has been paid to those owning an estate in such land, and provides that highways may be so occupied.

If the view taken in the majority opinion is to prevail, every modern method of transporting persons and property, and all means of intercommunication, stationary and movable, may be used on the rural highway. Every use made of a city street, and that includes all purposes which public necessity and convenience require, may be made of a rural highway without imposing additional burdens upon it. It will include telegraphs, steam and electric railroads for commercial purposes, pipes and conduits for gas and oil, aqueducts for water, as well as pneumatic tubes. No one will deny that new methods of locomotion and new movable vehicles, including bicycles, automobiles, steam-thrashers and portable engines may be used on a highway without subjecting it to a new servitude, but the profession will be surprised to learn that railroad-tracks and other permanent structures can be placed in highways for steam-railroads, and also that trolley-lines, which furnish the most modern manner of travel, may be constructed along the country roads without the consent of the adjoining owners. The

transportation of oil and gas is a business of a public character which is now exciting the attention and energies of the people of the state, and under the rules adopted the owners of these lines may excavate in front of farms and lay their pipes along the highways without paying the owners of the fee for the land taken. Likewise, companies organized for the transportation of letters and parcels through pneumatic tubes may construct and maintain stationary appliances in the road without compensating the adjacent owners. If telephone and telegraph companies may permanently and exclusively occupy portions of the highways with their lines because they are modern media of transmitting information, why may not telegraph companies use the latest device of Marconi, and build towers opposite farms to transmit intelligence from station to station by wireless telegraphy?

I think that the function of a telephone is quite apart from the purpose for which the highway was designed when the easement was acquired. All methods whereby a part of the rural highway is exclusively and continuously occupied is a new use and constitutes an additional burden, which entitles the person over whose land the highway is laid to compensation. The authorities are very nearly uniform, however much they may differ as to reasons, that a telephone is not within the scope and purpose of a rural highway. (*Eels v. A. T. & T. Co.*, 143 N. Y. 133, 38 N. E. 202, 25 L. R. A. 640; *Board of Trade Tel. Co. v. Barnett*, 107 Ill. 507, 47 Am. Rep. 453; *Postal Telegraph Co. v. Eaton*, 170 id. 513, 49 N. E. 365, 39 L. R. A. 722, 62 Am. St. Rep. 390; *Daily et al. v. State*, 51 Ohio St. 348, 37 N. E. 710, 24 L. R. A. 724, 46 Am. St. Rep. 578; *Callen v. Electric Light Co.*, 66 id. 166, 64 N. E. 141, 58 L. R. A. 782; *Western*

*Union Tel. Co. v. Williams*, 86 Va. 696, 11 S. E. 106, 8 L. R. A. 429, 19 Am. St. Rep. 908; *Kreuger and another v. Wisconsin Telephone Co.*, 106 Wis. 96, 81 N. W. 1041, 50 L. R. A. 298; *Stowers v. Postal Tel. Co.*, 68 Miss. 559, 9 South. 356, 12 L. R. A. 864, 24 Am. St. Rep. 290; *Chesapeake and Potomac Telephone Co. v. Mackenzie*, 74 Md. 36, 21 Atl. 690, 28 Am. St. Rep. 219; *Halsey v. Rapid Transit Street Railway Co.*, 47 N. J. Eq. 380, 20 Atl. 859; *Nicoll v. Telephone Co.*, 62 N. J. L. 733, 42 Atl. 583, 72 Am. St. Rep. 666; *Donovan v. Allert*, 11 N. Dak. 289, 91 N. W. 441, 58 L. R. A. 775, 95 Am. St. Rep. 720; *Spokane v. Colby*, 16 Wash. 610, 48 Pac. 248; *Bronson v. Abion Telephone Co.*, [Neb.] 60 L. R. A. 427; *Pacific Postal Tel. Cable Co. v. Irvine*, 49 Fed. [C. C.] 113; *Kester v. Western Union Tel. Co.*, 108 id. [C. C.] 926; *Kincaid v. The Indianapolis Natural Gas Company et al.*, 124 Ind. 577, 24 N. E. 1066, 8 L. R. A. 602, 19 Am. St. Rep. 113; *A. & P. Telegraph Co. v. C. R. I. & P. R. R. Co.*, 6 Bissell [C. C.] 158, Fed. Cas. No. 632.)

In all of the cases cited in support of the other view, only the decisions in two states — Minnesota and Michigan—involved a rural highway. In some of the other cases cited to sustain the trial court there was some general language used, and some reasons given, which seemingly support the view that a telegraph or telephone line is not an additional servitude on a rural highway, but in each of them the court was speaking of the scope and purpose of a city street, and most of them recognize a difference between that and a country road. For instance, the supreme court of Missouri, in *Julia Building Ass'n v. The Bell Telephone Co.*, supra, called attention to the distinction between roads in the country and streets in the city, and indicated that a different rule applies in the considera-

15—69 KAN.

tion of the interest which the public acquires in a highway and in a street. In *Magee v. Overshiner*, supra, a street case, it was said :

"There is an essential distinction between urban and suburban highways, and the rights of the abutters are much more limited in the case of urban streets than they are in the case of suburban ways."

The case of *Castle v. Telephone Co.*, supra, calls attention to the fact that public easements in the streets of cities and villages are much more extensive than a country highway. The same may be said of *Lockhart v. Railway Co.*, supra, where it was said that "what might be considered an invasion of private right, so far as the use of a highway is concerned, in the country, might not be so in a city."

In the two cases holding that the telephone is not an additional servitude on the rural highway, the Minnesota decision was made by a bare majority, (and even in that state it was held that a railroad is an additional burden on a city street,) and in the Michigan case there was also a strong dissent, and in the prevailing opinion it was said that under the statutes of that state any damages sustained by the adjoining owner by the erection of the poles in the highway could be recovered.

It is interesting to notice the view taken of this question by authors of text-books. For instance, in Joyce on Electrical Law, section 321, it is said :

"We are of the opinion that the construction of telegraph and telephone lines upon the highways or streets is not within the original purposes of the dedication or taking of the same, and that the poles and wires constitute an additional servitude, entitling the abutting owner to compensation."

In volume 2 of Dillon on Municipal Corporations, fifth edition, section 698a, it is remarked :

"On the whole the safer and perhaps sounder view is that such a use of the street or highway, attended as it may be, especially in cities, with serious damage and inconvenience to the abutting owner, is not a street or highway use proper, and hence entitles such owner to compensation for such use, or for any actual injury to his property caused by the poles and lines of wire placed in front thereof."

In Elliott on Roads and Streets, 534, it is said :

"We are inclined to the opinion that such a use constitutes a new burden, for which the owner of the fee is entitled to compensation."

In Lewis on Eminent Domain, section 131, the author says :

"The lines of a telegraph or telephone company are on the same footing as the steam railroad.  They form no part of the equipment of a public highway, but are entirely foreign to its use.  Where the fee of the street is in the abutting owner, he is clearly entitled to compensation for the additional burden placed upon his land."

In Crosswell on the Law Relating to Electricity, section 110, it is said :

"The use of the highways, however, for the transmission of intelligence is a use wholly different from public travel.  Incidentally, no doubt, it effects somewhat similar objects. . . . The nature of the use, however, is essentially different, and the courts have generally recognized this difference."

In Randolph on Eminent Domain, section 407, the difference of opinion on the question is recognized, and it is remarked that "the prevailing opinion seems to be that the plant is an additional servitude."

Justices CUNNINGHAM and MASON are of the opinion that the decision first made should be adhered to and join with me in this dissent.

BURCH, J. (concurring): The Chinese have boots for the feet which prevent their natural growth and development beyond the measure of childhood days. Old decisions rendered without any possible conception or consideration of future circumstances and conditions ought not to be allowed to produce the same effect on the law of a commonwealth.

The case of *Caulkins v. Matthews*, 5 Kan. 191, was decided in 1869. The suit was brought to recover for the loss of a horse described as "blind of an eye," which fell into an open well on private grounds unenclosed. There was no road through the premises, and the horse was not injured upon any road. The court, however, in speculating upon what might have been the rights of the plaintiff at a place where his horse was not injured if there had been a road there, said that it could hardly be supposed that he could make pasture-fields of the public highways; that men may pass and repass with their stock upon the public highways, but that such is the extent of their right— meaning, of course, their right with respect to stock on the highway.

In 1873 the case of *Comm'rs of Shawnee Co. v. Beckwith*, 10 Kan. 603, was decided. A road was laid out which embraced a hedge within its limits. The landowner wanted damages for a total deprivation of the hedge which was removable. The court held that his damage was the cost of removing the hedge and any depreciation it suffered by removal. Why it was not the duty of the road overseer to remove the hedge as an obstruction to travel does not appear. In the

opinion it was said that nothing connected with the land passes to the public except what is actually necessary to make the road *a good and sufficient thoroughfare for the public;* that the public obtains a mere easement in the land; that the fee remains in the owner; that he continues to own everything connected with it which is *not necessary* for the public use *as a highway;* and that he may. remove trees, grass, hedges, fences, buildings, etc., so long as he does not interfere *with the use of the road as a public highway.* All of this, it may be conceded, is true to-day, and perfectly true for the plaintiff in this case after the defendant's telephone-poles are up. But the court, having in mind the Caulkins-Matthews case, cited it as authority upon the rights of the public generally in a regularly laid-out highway. Even if the decision were open to the interpretation that the public use of a highway is limited to travel and passing from place to place, I do not think that a blind horse, which in 1869 fell into a well where there was no road, ought now to block the public highways of the state to expanding and increasing public necessities and uses. However, the court did not limit the use of a highway to passing and repassing or to such acts only as involve motion. The language is: "It [the public] obtains the right for persons to pass and repass, *and to use the road as a public highway* only, and nothing more." That is all I claim for the public in this action.

The law upon this subject has been too much confused by fictions which do not coincide with the facts. I should like to square the law as nearly as possible with the facts. In cities the fiction is that the fee of streets is in the county. But the county is not a real proprietor. If the streets be vacated the title of the county vanishes. The fiction is used merely to

express the fact that the public has full rights over the streets for public purposes. In the country the fiction is that the public has a mere easement. As a matter of substantial fact, the owner loses his land, and fully understands that he loses it, when condemnation is made. True, he may quarry under the road if he do not impair it, and may do some things upon the surface of the ground if he do not obstruct the public—it is a crime for him to scour his plows there; and if it should ever be vacated full dominion will reattach. But the public acquires the right to exclude him absolutely, if necessary, and in point of practical fact, as opposed to legal theory, does exclude him from it except as an abutter and as one of the public. When, therefore, the road is subjected to a new use there is no substantial damage. The concluding words of the paragraph quoted from Joyce on Electrical Law in the dissenting opinion are these :

"The amount of compensation to which he is entitled would, in most cases, however, be *purely nominal.*"

In Keasbey on Electrical Wires, at pages 126, 127, the following statements occur :

"There must be an extension of the uses to which streets are put, and so long as they serve the public convenience, and do not affect the use formerly enjoyed by the landowner, there would seem to be no good reason why the landowner should have a right to object, since, in such a case, if he were entitled to damages, they would *amount* to *nothing*. . . . Another difficulty is that it is hard to distinguish between a rural and an urban street, and that the nature of a street changes insensibly from the former to the latter, and a rule of property which depends on such a shifting and indefinite distinction is not likely to prove satisfactory."

That there was no substantial damage in this case

McCann v. Telephone Co.

is shown by the agreed facts. The following utterly petty and trivial matters are all the plaintiff could muster in order to obtain an extraordinary remedy in a court of equity with which to oppose a work of great public interest and importance :

"That the erection of the poles and the construction of said line would *to some extent* interfere with the mowing of grass and weeds next to the hedge and along the public highway, and with the trimming of the hedge *with a machine;* that this plaintiff has a machine with which he can trim the hedge, but that he never has trimmed the hedge with a machine ; that the plaintiff has mowed the weeds and grass along the outside of said hedge with a machine ; that there is a little piece of hedge along section 15 which Mr. McCann bought from Mr. Ellis that has some sumac growing in the public highway but not next to the hedge ; that there is a wire fence there and it is set in about four feet, and the sumac is in the highway and not next to the fence."

I am not in favor of opening the courts to injunction suits which are purely obstructive, which are brought merely for the vindication of a theory, and which have for their basis nothing more than an intangible interest in land which suffers nothing but an imaginary injury.

There can be no doubt that the representatives of the people of this state have always heretofore regarded the construction of telegraph and telephone lines upon the public highways as imposing no additional burden. In 1868 the legislature passed an act which provides as follows :

"Corporations created for the purpose of constructing and maintaining magnetic-telegraph lines are authorized to set their poles, piers, abutments, wires and other fixtures along, upon, and across, any of the public roads, streets and waters of this state, in such manner as not to incommode the public in the use of

such roads, streets, and waters.'' (Gen. Stat. 1868, ch. 23, § 74; Gen. Stat. 1901, § 1342.)

In 1885 it passed an act authorizing the organization of corporations for the construction and maintenance of telephone lines, and providing as follows:

"All such corporations shall have all the rights and powers conferred, and be subject to all the liabilities and duties imposed, by the general laws of this state upon telegraph corporations.'' (Laws 1885, ch. 104, § 2; Gen. Stat 1901, § 1252.)

Acquiescence for so many years in these acts which make no reference whatever to additional compensation amounts to a popular approval of the enlarged use of the highways of the state here contended for. It is true that a telephone-pole does monopolize that portion of a public highway which it occupies. The monopoly, however, is entirely reasonable. It obstructs and interferes with no other highway use, and is entirely compatible with all other highway uses at all times. Since it cannot be seriously controverted that the telephone is now an invaluable adjunct to travel and other highway purposes acknowledged to be proper, the principle announced in *W. U. Telegraph Co. v. Rich*, 19 Kan. 517, 27 Am. Rep. 159, ought to apply. In that case land was condemned for a railroad which obtained a mere easement. The fee and the right to make use of the land in all ways not incompatible with the interests of the railroad remained in the landowner. Then a telegraph line was established over the condemned tract. There was the same opportunity to say in that suit that there is in this one that the owner was being deprived of his land; that there was no reason for him to make a donation of his property to private or to public interests; and that the advance of civilization should not be

McCann v. Telephone Co.

made at the expense of the few. But Mr. Justice Brewer disposed of the matter by saying that the construction of the telegraph line was "*damnum absque injuria*, . . . or perhaps more correctly, it was damages already paid for."

Telephone-poles cannot be excluded from the highway merely because they are immovable. To immobility must be added an unreasonable interference with the general use of the highway or an unreasonable interference with the rights of the abutter, and herein lies the fallacy of the argument *in terrorem* of my dissenting associates. It does not follow from the fact that a telephone line may be established upon the highway that a railroad may be built there or that a transportation company may dig a canal along its length and fill it with a fleet of boats. It is perfectly plain that new uses may not be allowed to overthrow, or even substantially to impair, the old.

The decision of cases of the character indicated may safely be left until they shall arise. Meanwhile, the one under consideration ought not to be determined by a counting of the cases on either side of the proposition involved. The strongest reasons should control. Those so ably presented by Chief Justice Johnston in the majority opinion, though in opposition to his personal view, and the considerations noted above impel me to concur in affirming the judgment of the district court.