Marshall, C. J.,
concurring. The plaintiff in error in this action is the owner of premises abutting upon Southern avenue in Bucyrus, Ohio. Prior to the bringing of this action the city of Bu-cyrus had granted - a franchise to The Central Power Company to supply electric current to the city and its inhabitants for the period of fifty years, and to use the streets, alleys and public places of the city for the purpose of constructing and erecting poles, wires and other necessary fixtures and appliances for the purpose of distributing such current. The city had also entered into a contract for such service with The Bucyrus Light & Power Company, which contract was assigned'by The Bu-cyrus Light & Power Company to The Central Power Company. The Power Company has no plant for the production of electric energy within the city of Bucyrus, but such energy is created at other points and carried into and through Bucyrus by means of wires capable of transmitting 66,000 volts of electric current. This voltage is more than is necessary for the city of Bucyrus, and the wires are intended as trunk lines for transmitting such energy to other cities, and it is also intended that the same wires may if occasion requires transmit current from -either direction from plants located east and west of Bucyrus. Poles have been constructed on the tree line between the lot line and the curb line in front of the property of plaintiff, such poles being fifty-two feet in height, and the wires have been attached thereto by-the usual methods.
The poles along Southern avenue carry-the trunk *683 lines, thereby transmitting electric energy into the city to a transforming plant, from whence the current is distributed over other wires to the city and its inhabitants; and some of the distributing wires are also carried along Southern avenue on the same poles for the purpose of lighting Southern avenue and furnishing electric current to the residents of that street. The trunk lines are carried on cross-arms about twelve feet higher than the cross-arms which carry the distributing wires.
It is claimed that the high-voltage wires are a menace to the lives and property of the residents of Southern avenue and that the same are an added burden upon plaintiff’s enjoyment of his property, and that the erection of the poles interferes with his ingress to and egress from his premises. The rights given to The Central Power Company- by the franchise-ordinance are not confined to those necessary facilities for rendering service to the city and its inhabitants, but by the terms of the ordinance the lines for the distribution of electric energy may be used to serve persons, firms and corporations beyond the limits of the city. It is apparent that the purpose in thus burdening the grant was to make full provision for the lines being trunk lines, to permit the current to be transmitted from the power plants both on the east and west of the city of Bucyrus.
Upon the trial of the cause in both of the lower courts the judgment was in favor of the defendant.
While we have a printed record and briefs in but one cause, there are three other causes in which the facts are substantially similar and the same legal *684 questions involved, in which, by stipulation, the same judgment is to be rendered.
A proper determination of the legal questions in this cause involves a number of inquiries, the first of which is as to the relative rights of the abutting property owners and the city of Bucyrus. The city of Bucyrus having granted a franchise-ordinance and entered into a contract with the defendant, we will first inquire as to the power and authority of the city over the streets of the city and the force and effect to be given the ordinance so granted and contract so entered into.
The title, rights and uses of a municipal corporation in streets, alleys and other public places rest in part at least in legislative provisions. This is more especially true of dedications of streets and alleys made by persons laying out subdivisions .or additions to municipal corporations. Sections 3580 to 3592, General Code, both inclusive, make full provision for such additions and subdivisions and it is provided in Section 3585 as follows:
“The map or plat so recorded shall thereupon be a sufficient conveyance to vest in the municipal corporation the fee of the parcel or parcels of land designated or intended for streets, alleys, ways, commons, or other public uses, to be held in the corporate name in trust to and for the uses and purposes in the instrument set forth and expressed, designated, or intended.”
Nowhere in the record in this cause does it appear in what manner Southern avenue was dedicated to the public use, or whether it was acquired by condemnation proceedings, neither are we put in *685 possession of any particular conditions or reservations to such dedication, and it will therefore have to be presumed that the public has such rights in Southern avenue as are provided in Section 3585, as said section has been construed by former decisions of this court. It is very clear from those decisions that the city does not hold the fee absolute, but rather that it is a determinable and qualified fee m trust for all necessary street uses and other public uses necessary to the city and its inhabitants which will not encroach upon the property rights of the abutting owners in the street. Such is the spirit of the former decisions of this court as expressed in the following cases: Cincinnati & Spring Grove Ave. Street Ry. Co. v. Incorporated Village of Cumminsville, 14 Ohio St., 523, 546, and Hamilton, Glendale & Cincinnati Traction Co. v. Parish, 67 Ohio St., 181, 190.
Further statutory provision is found in Section 3714, General Code, which provides: “The council shall have the care, supervision and control of public highways, streets, avenues, alleys, sidewalks, public grounds, bridges, aqueducts, and viaducts, within the corporation, and shall cause them to be kept open, in repair, and free from nuisance.”
Still further provision is found in the chapter of enumeration of powers of municipalities, relating more especially to electric wires and equipment, in Section 3637, General Code, which reads in part as follows: “And * * * , to regulate the construction and repair of wires, poles, plants and all equipment to be used for the generation and application of electricity;” etc.
*686 In Section 3809, General Code, it is provided that a city council may “contract with any person, firm or company for lighting the streets, alleys, lands, lanes, squares and public places in the municipal corporation,” etc.
Practically the same provision is found in Section 3994, General Code, which reads: “A municipal corporation may contract with any company for supplying, with electric light, natural or artificial gas, for the purpose of lighting or heating the streets, squares and other public places and buildings in the corporation limits.”
It is ffirther provided, in Section 9192, General Code, that the provisions of the chapter relating to telegraph and telephone companies shall with certain exceptions apply also to electric light and power companies.
Section 9173, General Code, seems to place a restriction upon the location of any telegraph pole, pier, abutment, wires or other fixtures, requiring that no such appliance be placed so near to an edifice as to occasion injury or risk of injury thereto in case such pole or other appliance be overthrown.
It is, however, stated in Section 9173, that such provision shall not apply in cases' “hereinafter provided for.” It seems very clear therefore that in some excepted cases other statutory provisions were made which would obviate such restriction. The provisions “hereinafter provided for” must be Sections 9193 and 9195, General Code, which give full control to municipalities over lines, wires, fixtures and appliances for transmission of electricity for *687 lighting, heating or power purposes through the streets and public ways of such municipalities.
By virtue of the foregoing statutory provisions, above referred to, the power and authority of the municipal authorities over thé streets, alleys and public places, relating to electric lights, poles, wires, fixtures and appliances, are very comprehensive, but of course such power and authority must not be employed in contravention of the rights and privileges of the abutting owners in such streets and alleys. It is therefore proper at this time to inquire into the title, rights and privileges of the abutting owner in adjacent streets.
Considerable light has been thrown upon this question by some of the former decisions of this court. The result of those decisions has given a very large discretion to the general assembly in the matter of easements to be granted to public utilities, and yet this discretion has not been permitted to extend to a diversion of the public highways to purposes other than well recognized street and highway purposes. Neither have the former- decisions of this court permitted such additional burdens upon such highways as to destroy or even materially impair the rights of the adjoining owner therein.
It has been a matter of some difficulty to reach the true distinction between those rights which have been granted and those which have been reserved in cases where, as in the case at bar, the dedication has been general and without any expression of the uses and purposes having been made in the instrument of dedication. In such cases it must be *688 determined what reservations are made by law attaching as incidents to the property of the adjoining, owner.
In the Bill of Rights, Section 19, Article I of the Ohio Constitution, it is provided: “Private property shall ever be held inviolate, but subservient to the public welfare. * * * Where private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money; and such compensation shall be assessed by a jury, without deduction tor benefits to any property of the owner.”
This provision of the Bill of Rights undoubtedly applies to the appropriation of any “property” rights of an abutting owner in the adjacent streets. Clearly iC cannot extend to any rights other than property rights. The constitutional provision so states, and it has repeatedly been so held by the former decisions of this court.
In the case of Crawford v. Village of Delaware, 7 Ohio St., 459, this principle was first clearly recognized, and in that case the court at page 469 made use of the following language: “The latter have a peculiar interest in the street, which neither the local nor the general public can pretend to claim : a private right of the nature of an incorporated [incorporeal] hereditament, legally attached to their contiguous grounds, and the erections thereon; an incidental title to certain facilities and franchises, assured to them by contracts and by law, and without which their property would be comparatively of little value. This easement, appendant to the lots, *689 unlike any right of one lot-owner in the lot of another, is as much property as the lot itself.”
The foregoing case involved a change of grade of the street in front of the plaintiff’s property and the principle decided was as to whether a change of grade which interfered with ingress and egress interfered with a property right. Since that case this court has made a more definite pronouncement upon this proposition in the case of Hamilton, Glendale & Cincinnati Traction Co. v. Parish, 67 Ohio St., 181, from the opinion of which, at page 191, we quote:
“While the abutting lot owner has this right of public travel on the street, and the right of ingress and egress from the street to his lots, the public authorities retain the right to improve the street, and place such means of travel thereon as in their judgment shall best conserve the public welfare. And so long as his easement of ingress and egress is not materially injured, he is without remedy, because he is not wronged, said easement — all the property right he has in the street — not being interfered with. If, however, his easement of ingress and egress should be materially injured by the building and operation of the street railroad, then he must be first fully compensated for such injury. This in substance is the holding of this court in Street Railroad v. Cumminsville, 14 Ohio St., 523, and subsequent cases on this subject. His easement of ingress and egress being the only property right he has in the street, the city authorities had the power, under the constitution, to construct and ‘Operate *690 a street railroad on and along the street without his consent and against his will, unless restrained by statute, provided they caused no material interference with his easement of ingress and egress.”
The court in that case was of course deciding only the question before the court and it was perhaps rather too narrow a view to state that the easement of access is the only property right which an abutting owner has in the adjacent street. The courts generally have recognized the claims that light, air and view are also property rights which may not be interfered with or appropriated to the public use without compensation. The abutting owner in common with the general public has a right to the use of an adjacent street for purposes of travel, transportation and communication, and in addition thereto certain rights which are peculiar to himself because of his ownership of the property abutting thereon. These special rights in the street do not include the right to prevent the construction in the streets of appliances which have been authorized by the authorities of the municipality, merely on the ground that such appliances are a menace to life and property, unless such menace is peculiar to the particular abutting owner who is complaining.
In the case at bar the city of Bucyrus cannot be supplied with electric energy .without the setting of poles for the purpose of stringing the trunk lines thereon and also for the purpose of stringing the distributing wires over the streets and alleys throughout the city. In order to have the convenience of electricity throughout cities generally, it *691 is necessary that the electric energy should be transported by means of wires over the streets, alleys and public places. It would be manifestly impossible to keep entirely on private property.
It must be admitted that the decisions heretofore have not been uniform. The earlier decisions did not have to deal with the complex and modern uses to which streets and highways are now subjected, and with the expanding civilization there must necessarily be some expansion of the rules which have been heretofore laid down. In some of the decisions it is stated that streets and highways are for the purpose of public travel. This restricted view is natural because in primitive times nothing beyond individual travel was even contemplated. As civilization progressed, transportation, communication of messages, and many municipal uses, including the product and service of the many public utilities which are now recognized by Ohio statutes, began to utilize our highways.
Some distinction is sought to be made between those uses which were under contemplation at the time the highways were established and those uses which have come into vogue long after such establishment, and some distinction is made by some of the cases between public and private uses. But it is difficult to see how either of such distinctions has the sanction of sound reasoning. Some of the highways of our state were originally Indian paths or paths established by wild animals. By a process of evolution they successively became footpaths of the settlers, bridle paths, ways for pack animals, ways for horse-drawn vehicles, ways for 'motor-propelled *692 vehicles and electric street cars, ways for wires for telephone and telegraph service and for the transmission of electric energy, ways for pipes for water, sewage, gas, steam, hot water and other utilities.
Some of the streets of some of our cities have been so recently laid out that it can fairly be stated that many and all of these uses might well have been contemplated. Others of the streets of our older cities are established along the lines of the original highways and were laid out at a time when none of the modern uses and utilities was in vogue, or even known.
Can it be said that a different rule should be applied to the streets which were formerly the early highways, and that as to those streets only those uses be authorized which were fairly under contemplation at the time they were laid out? Under such a rule it would be necessary first to ascertain the date of the establishment of such a road and to make a study of the progress of civilization up to that time, the result of which would be to have a different rule for each street and highway.
Endless confusion would necessarily arise by drawing a distinction between public and private use and between those uses which were in contemplation at the time the highways were established and those which have come into vogue by the later evolution of civilization.'
The evolution of public utilities and the widespread and ever-increasing use of public utility service throughout the state have greatly varied the uses of the streets and highways. It is doubtful whether this great variety of uses has really in *693 creased the burdens. The increased burdens upon the highways are caused primarily by the largely increased population, and the demands of the people for necessities, conveniences and luxuries of modern living conditions. It has been found more economical as well as more speedy to transport merchandise and passengers by rail, to convey electrical energy for light, heat and power and to transmit messages and information by wires, and to convey gas for fuel and lighting and water for municipal purposes by pipe lines, and other utilities by still other and different methods. It is hardly correct to say that by such new adaptations the streets and highways are subjected to uses not contemplated when highways were laid out many years ago. It would be more correct to say that present uses are the progression and modern development of the same uses and purposes. The new appliances are but rapid transit methods of supplying the modern wants of the people, the wires supplanting the messenger, the carrier and the postman, and the rails and pipe lines supplanting in part the vehicular traffic.
To demonstrate the necessities of modern civilization, and the industrial and civic progress of the state of Ohio, a few facts and figures compiled in the office of the Public Utilities Commission will be found useful. In a population of approximately five and one-half millions, there are 933,011 customers of natural gas, 785,755 telephone subscribers, an increase of more than 20,000 in one year, 602,618 customers of electric light and power companies; and more than one billion passengers *694 were carried by the electric railways of the state in 1920.
In the production and distribution of electrical energy Ohio ranks fifth among the states of the Union, having produced nearly 3 million kilowatt hours during 1920. More than one-half the farmers of Ohio have telephones, the state taking fourth rank in this respect.
The utilities have an investment of more than one billion dollars, distributed among 120,000 stockholders, and pay to the state nineteen millions in taxes..
It is also a significant fact that a large part of the cost and expense of improvement of the streets and highways is paid out of public funds. The public should therefore be entitled to an amplified use of that which it has furnished material aid in improving.
Every property owner and every family, whether owning property or not, is benefited by such utilities, and the mere fact of wires, rails and pipes passing along the highways without interference with property rights should not justly be held to give rise to claims for damage or afford ground for injunction. Any unjust allowance of damages to abutting owners would be in the nature of exacting tolls, and would further increase the present high cost of living.
There are many reported cases which have a bearing upon-the principles involved in this discussion, but they cannot be harmonized or even reconciled. Many of them were decided in the light of conditions of progress and civilization quite dif *695 ferent from those existing today. It is very likely that within the next fifty or one hundred years conditions will have undergone another great change. Even so, an adherence to the broad statement of principles herein enunciated will stand the test of time.
In a more primitive state, every family lived simply, largely supplying all wants within its own range of activities, therefore having little need of travel, communication and transportation: As civilization has progressed, specialization has also progressed, and now nearly all the wants of humankind are the subject of interchange and traffic. The resulting commercial intercourse has by a process of evolution almost bordering on revolution made our streets and highways those busy arteries of commerce, and has given rise to such suits as the case at bar. Some of our courts have not kept step with the procession, while others have adopted and followed that broader view of the relation between the abutting property rights and the adjacent highway easements and privileges. Surely the latter line of decisions has correctly sounded the true doctrine.
It is because the authorities are so contradictory and so irreconcilable that I have discussed this proposition at so great length upon principle. It will, however, be profitable to refer to some of the authorities which have sounded the more progressive doctrine.
This proposition has been discussed in Curtis on the Law of Electricity, Section 281, from which the following is taken: “It is practically undisputed *696 that an electric line constructed for the purpose of furnishing light for a street or highway does not impose an additional servitude upon' the owners of lands adjoining such street or highway, when such line does not interfere with the owner’s right of ingress to and egress from his premises.”
A large number of cases are cited in support of this text, but the limitations of this opinion will not permit any further discussion.
In the case of Julia Building Assn. v. Bell Telephone Co., 88 Mo., 258, there is a lengthy discussion of principles which will be found in full accord with the views hereinbefore stated. We quote from the syllabus as follows: “It is only when the street is, subjected to- a new servitude inconsistent with and subversive of its proper use as a street, that the abutting land owner can complain. * * * In no event would compensation in such case be allowed for speculative or contingent damages.”
In the case of People v. Eaton, 100 Mich., 208, it is held that statutes authorizing the construction of telegraph lines, along highways are not in .conflict with the constitution of that state providing that property may not be taken for public use without compensation. We quote from page 211 of the opinion as follows: “It has been settled in this State that lands taken or granted for public highways are so taken or granted for all the purposes for which they may be used for the benefit of the public, for the passing .and repassing of travelers thereon, and for the transportation of passengers by stage coach, omnibus, or street cars propelled by horses, steam, or electricity, and that the laying of *697 tracks for such street cars is not an additional servitude upon the lands of adjacent proprietors.”
The cases of Cater v. Northwestern Telephone Exchange Co., 60 Minn., 539, and Magee v. Overshiner, 150 Ind., 127, are in full harmony with the conclusions reached herein and the discussion found in the opinions in those cases is quite clear and convincing.
Inasmuch as one of the elements of this controversy involves the use of trunk-line wires, along Southern avenue and also involves the fact that electric energy is transported through the city of Bucyrus for the use of patrons living outside and beyond the city, two authorities having a bearing upon that question are cited.
In the case of Cheney v. Barker, 84 N. E. Rep., 492 (198 Mass., 356), decided by the supreme court of Massachusetts in 1908, the following is found in the second paragraph of the syllabus: “Since highways are established by state authority for the general good, since laws of Massachusetts make no distinction between them as to rural ways or urban streets or otherwise, and since the Legislature has supreme authority respecting public rights in streets and highways, the Legislature may provide for the use of highways, as well for through travel as for the through transmission of gas, water, or other commodities from one place to another, regardless of the question whether any municipality through which the ways may pass, or those who own the soil of the ways subject to the public easement therein, are served or in any way benefited by such use.”
In the opinion, on page 494, this syllabus is *698 amplified and the court cites cases decided by the courts of New York, Indiana, Kentucky, Pennsylvania and Massachusetts.
In the case of Brandt v. Spokane & Inland Empire Rd. Co., 138 Pac. Rep., 871 (78 Wash., 214), the following declaration is found in the first paragraph of the syllabus: “Where a street railway had a franchise to string its electric wires on any of the streets of a city, the planting of poles and the stringing of wires on a street in which there was no car line, to carry the electricity to points where it could be used to operate street cars does not impose an additional servitude on the street, and abutting landowners cannot claim compensation for such use of the street; the dedication of the street to the public making it a part of the general street system, and such use being for the general benefit.”
Let us next turn our attention to those allegations in the petition reláting to the dangerous character of the high-voltage wires and the claim of plaintiff that they constitute a menace to human life and property. Even conceding that they are a highly dangerous agency they are nevertheless in such general use in all cities that it cannot be fairly claimed that they amount to a nuisance unless the manner of erection and construction and maintenance be faulty and not in accordance with the usual mode and custom prevailing. The record in this cause discloses that the construction is unusually strong and that the trunk lines are carried twelve feet higher than the distributing lines, which places the danger of those wires beyond all ordinary risk, and in fact the only apparent risk is that the *699 wires might possibly be thrown down. The same is, however, equally true of the distributing wires, and the uncontroverted evidence shows that the distributing wires are just as dangerous as the wires carrying the higher voltage, because contact with a wire carrying 3200 volts would be fatal. The mere fact of the danger attendant upon the maintenance of high-voltage wires in front of the property is not a valid ground of objection unless it is also an interference with access, light, air, or view. It appears that the construction is entirely beyond the lot line of plaintiff and it is difficult to see any difference between wires of this character and the ordinary trolley wires of street railroads. It cannot be denied that the trolley wires of street railroads carry dangerous electric current, and it is equally apparent that passing cars are dangerous agencies. But they are nevertheless in harmony with the progressive spirit of the times, which demands rapid transit and conveniences of travel and communication, and the courts have therefore refused to enjoin them on the ground of the attendant dangers.
If the menace of trolley wires in the middle of the street is of different character from the menace of high-voltage trunk lines carrying electric energy over the sidewalk, and if any different rule of law is to be declared in the one case from that declared in the other, it would seem that inasmuch as the trolley wires are hung at a lower level, where they are constantly being worn and vibrated by the continuous contact of the trolley wheel, there is much greater danger of their being dislodged and thrown *700 down than there is of the trunk lines carried at a much higher level where the construction can be oí a much stronger character and where there is not the constant wear and tear. This is proper to be considered because it is alleged in the petition that the trunk lines will be a menace to safety and increase the danger of fires.
Without regard to the question of comparative dangers, there is another consideration which must receive attention. It must be borne in mind that the legislature authorizes the use of highways for such purposes, and that the city of Bucyrus has granted a franchise to this particular company and the company is erecting its poles and other appliances in a manner which is fully approved by the proper authorities of the city. The question arises therefore whether a structure installed by authority of legislative enactment, permitted by a public franchise, which is lawful in character, and which is lawfully constructed and operated, can under any circumstances constitute a public nuisance. This subject has been discussed by the courts and the doctrine very clearly stated in the case of Hewett v. Western Union Telegraph Co., 4 Mackey (D. C.), 424, 438. In that case the court had to deal with the following facts. Congress in 1863 passed a joint resolution regulating the construction of telegraph lines in the District of Columbia, and in 1866 passed an act authorizing the construction of telegraph lines over the postal roads throughout the United States. The commissioners of the District of Columbia gave their consent to the construction of telegraph, lines over the streets of the city of Washington and the *701 mode of use was specified. From the opinion, page 438, we quote: “That being so, the Commissioners having given their consent, the law of Congress having granted the power, it cannot be said that there can be any public nuisance arising out of the exercise of the grant in the mode proposed on the part of the defendants. The question of a public nuisance is entirely set at rest by the grant of power on the part of Congress and the concurrence of the guardians of the welfare of the public through the instrumentality of the Commissioners of the District.”
In the instant case the general assembly of Ohio and the city council of Bucyrus were dealing with a subject over which they had ample power and complete jurisdiction, and the cóurts may not interfere with their acts unless they have transgressed the constitution, which can only be true if “property” is being taken without compensation.
Under both state and federal constitutions our government is divided into three branches, and the greatest care should be exercised that none of the branches encroaches upon the powers and duties of the other branches. In the case at bar the legislative and executive branches of the state of Ohio .and of the city of Bucyrus have granted the right to construct these appliances in a certain manner. It would not be consistent with the powers, duties and jurisdiction of the judicial branch to decree that the acts of the other branches, which so far as this record shows have been entered into in good faith and have been carried out as agreed, constitute a public nuisance. The case of Hewett v. Telegraph *702 Co., above quoted, further discusses the questions as to whether the possible danger of the wires being blown down and the increasing menace of fire and other damage constitute valid reasons for granting relief. This discussion appears on pages 440 to 444, both inclusive, and the conclusion reached is in harmony with the conclusions of the court of appeals in this case.
In the instant case it does not appear that the use of Southern avenue by The Central Power Company, as shown by the pleadings and the evidence in this cause, is inconsistent with the reasonably safe and practical use of Southern avenue, or that it unreasonably impairs the special easements of the abutting owners for the purposes of access, light, air and view.
In order to reach a proper determination of the questions involved in this cause we cannot overlook two of the former decisions of this court which have not heretofore been referred to. In the case of Callen v. Columbus Edison Electric Light Co., 66 Ohio St., 166, it will be found that this court held that the placing of poles at the curb in a street and the stringing thereon of electric-light cable lines and wires for the purpose of furnishing light and energy to private takers is a diversion of the street from the purposes to which it was dedicated and therefore a taking of property within the meaning of Section 19 of the Bill of Rights. The statement of facts in that case is unsatisfactory and the conclusions reached are therefore somewhat confusing. It will be found, however, by an examination of pages 178 and 179 of the opinion, that the court *703 must have found as a fact in that case that there was an impairment of the owner’s access to the lot and an interference with the full enjoyment of the lot for the purposes to which it was adapted, and therefore a diversion in fact of the use of the street» from the purposes originally designed for it. On page 179 of the opinion it is further stated as a fact that the impairment of the value of plaintiff’s lot was serious by reason of the maintenance of the structures, by reason of new burdens being placed upon the land, and by reason of material impairment of the owner’s rights in the street. It will be seen, therefore, that the facts found in that case bring it clearly within the principles declared in the instant case.
In so far, however, as any distinction is attempted to be drawn between the right to enjoin the use of wires and poles at the curb for private business.purposes and the right to enjoin the use for strictly public purposes, if such distinction was meant in that case, it must be admitted that an affirmance of the judgment of the court of appeals in the instant case must necessarily overrule any such declarations.
The other case referred to is that of Schaaf v. Cleveland, Medina & Southern Rd. Co., 66 Ohio St., 215. While in that case an injunction was allowed against the construction of an electric railway and certain other electrical structures along the street in front of plaintiff’s property, it was clearly found as a fact that there was an invasion of plaintiff’s- property rights and a subjection of his property rights for the benefit of the corpora *704 tion, that additional burdens were imposed upon the street, not contemplated by the original dedication, and that there was an interference with access. A careful study of both those cases will show that except upon the point of an attempted distinction between-public and private users, they are in entire harmony with the principle declared in the instant case.
It is only fair to state at this time that in the preparation of this opinion valuable aid has been afforded by the very careful and well-considered opinion of Judge George L. Phillips of the Cuya-hoga county court of common pleas in the case of Stone v. Cuyahoga Light Co., 9 N. P., N. S., 545. The very clear, logical and comprehensive discussion in that- -case of principles pertaining to the use of streets by utilities is worthy of special commendation.
There is some evidence in this record that it is desired to establish a joint driveway along the lot lines of two of the owners and that a pole has been so erected as to interfere with the establishment of such a joint driveway. If this is true, the property owners are dearly entitled to have such pole removed in one direction or the other to permit the establishment of such way of ingress and egress, and mandatory injunction will clearly lie in the event the defendant should refuse to grant such reasonable request. It is not, 'however, the prayer of the petition in this case to have the location of any pole changed, but rather to have all the poles removed from the street.
Hough, J., concurs in this opinion.